**Gary C. GROSS, Angel Hartman, Appellants–Defendants,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**Nos. 33A05–0402–CR–100, 33A01–0402–CR–79.**

Court of Appeals of Indiana.

Nov. 12, 2004.

Amy K. Noe, Allen Wellman McNew, Richmond, IN, Attorney for Appellants.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Gary Gross and Angel Hartman appeal their two convictions each for Class D felony neglect of a dependent. We reverse.[1]

### Issue

The sole restated issue is whether there is sufficient evidence to support Gross' and Hartman's convictions.

### Facts

There is no meaningful conflict in the evidence in this case. During the spring and summer of 2003, Gross and Hartman lived together as roommates. On a day at the end of April, Hartman had custody of her children, C.H., age five, and B.H., age three (and who turned four at the begin-

ning of June 2003). Hartman shared custody of the children with their father. Also present that day were Gross' brother, Tom, and Gross' children, a boy age thirteen and two girls ages nine and six. Tom decided to play a game with the older children that Hartman referred to as "hostage," where their wrists and ankles were taped together with light construction tape[2] and the children competed to see who could break free first. The children had fun playing the game. B.H., who was sitting in a stroller on the porch, indicated that he too wanted to play. Gross taped B.H. into the stroller by wrapping the tape around his shoulders and waist. While Hartman was cutting the tape from behind the stroller with a pocketknife a few minutes later, B.H. reared back and sustained a superficial cut from the knife. After Gross treated the cut with ointment and a band-aid, B.H. returned to playing. However, Hartman indicated to the other children that the "hostage" game was over and disposed of the tape. After B.H.'s father noticed the cut and Hartman explained what had happened, the father expressed his disapproval of the "hostage" game.

Sometime in July, C.H. was again staying with Hartman and Gross. Gross' children were there also, as were Tom's two children, ages seven and twelve. The children again were taking turns having their wrists and ankles taped and were hopping about the house "like little rabbits." Tr. p. 127. C.H. asked to be taped, but was

---

1. Gross and Hartman were tried together, with essentially identical evidence presented as to both of them, and both were represented at trial by the same counsel, as they are on appeal. They also make identical arguments on appeal. Although no party has moved to consolidate Gross' and Hartman's appeals, we have consolidated them on our own motion pursuant to Indiana Appellate Rule 38(B).

2. A piece of tape similar to that used in the game is included in the exhibits. The tape is wider and somewhat thicker than ordinary scotch tape, but also somewhat thinner than duct tape.

unable to free herself from the tape around her wrists, so Hartman cut her loose with a pair of scissors. When C.H.'s father picked her up, he noticed tape residue on her wrists, which was pointed out to a doctor and led to an official child abuse investigation.

The State charged Hartman and Gross with two counts each of Class D felony neglect of a dependent, one with respect to the April incident involving B.H. and one with respect to the July incident involving C.H. No charges were filed against Tom Gross, nor were any filed with respect to any other children with whom Hartman and Gross played the taping "game." On December 8–9, 2003, a jury trial was conducted and Hartman and Gross were convicted as charged. They now appeal.

## Analysis

We employ a deferential standard of review when considering questions of the sufficiency of the evidence to support a conviction.

> In reviewing a sufficiency claim, we neither reweigh the evidence nor assess the credibility of the witnesses. We look to the evidence most favorable to the verdict and reasonable inferences drawn therefrom. We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. Nevertheless, evidence of guilt of substantial and probative value, as required to affirm a conviction, requires more than a mere scintilla of evidence. Evidence that only tends to support a conclusion of guilt is insufficient to sustain a conviction, as evidence must support the conclusion of guilt beyond a reasonable doubt.

*Whitaker v. State,* 778 N.E.2d 423, 425 (Ind.Ct.App.2002), (citations omitted) *trans. denied.*

The State charged Hartman and Gross under Indiana Code Section 35–46–1–4(a)(1), which provides: "A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally ... places the dependent in a situation that endangers the dependent's life or health ... commits neglect of a dependent, a Class D felony." A "knowing" mens rea under this statute is met if the accused "must have been subjectively aware of a high probability that he placed the dependent in a dangerous situation." *Armour v. State,* 479 N.E.2d 1294, 1297 (Ind.1985). Under the neglect statute, "health is not limited to one's physical state, but includes an individual's psychological, mental and emotional status." *Harrison v. State,* 644 N.E.2d 888, 890 (Ind.Ct.App.1994), *trans. denied.*

Some years ago, our supreme court cautioned against reading the neglect statute too broadly in *State v. Downey,* 476 N.E.2d 121 (Ind.1985), a case that addressed whether the statute was unconstitutionally vague. The case analyzed a version of Indiana Code Section 35–46–1–4(a)(1) that criminalized intentionally or knowingly placing a dependent in a situation that "may" endanger his or her life or health. *Id.* at 123. The court noted that under a literal interpretation of the statute, "it would be a crime to raise a child in a high-rise apartment or to mop the kitchen floor with a bucket of water in the presence of a small child. This is the literal intendment of the provision, but that is not a rational intendment." *Id.* The court went on to state "that there must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur." *Id.* (citing *Stone v. State,* 220 Ind. 165, 41 N.E.2d 609 (1942)). It concluded that construing the

statute literally would render it unconstitutionally vague. *Id.*

To avoid striking down the neglect statute, however, the court read the word "may" out of the statute. *Id.* It also held that the statute must be read as applying only to situations that expose a dependent to an "actual and appreciable" danger to life or health. *Id.* The court found this construction to be consistent with the evident purpose of the neglect statute, which is "to authorize the intervention of the police power to prevent harmful consequences and injury to dependents" without having to wait for actual loss of life or limb. *Id.* In 1999, and in accordance with *Downey,* the General Assembly removed the word "may" from the neglect statute. It is plain, however, that *Downey's* concerns regarding the potential overbreadth of the statute and the requirement that a danger be "actual and appreciable" persist.

It seems clear that to be an "actual and appreciable" danger for purposes of the neglect statute when children are concerned, the child must be exposed to some risk of physical or mental harm that goes substantially beyond the normal risk of bumps, bruises, or even worse that accompany the activities of the average child. This is consistent with a "knowing" mens rea, which requires subjective awareness of a "high probability" that a dependent has been placed in a dangerous situation, not just any probability. *See Armour,* 479 N.E.2d at 1297. We would note, for example, that allowing a child to ride a bicycle arguably could fall within the literal purview of the neglect statute, given that several hundred persons die and many thousands more are injured each year in cycling accidents. *See* National Highway Traffic Safety Administration, *Traffic Safety Facts 2002* (stating that 662 cyclists were killed and 48,000 were injured in 2002 traffic accidents, with twenty-four

percent of deaths and thirty-nine percent of injuries involving children under sixteen years of age), *available at http://www–nrd. nhtsa.dot.gov/pdf/nrd–30/ NCSA/TSF2002/2002 pcyfacts.pdf.* Riding a bicycle clearly endangers a child's life or health, according to the literal language of the neglect statute, but no rational person could read it as reaching so far as to criminalize allowing one's child to ride a bike. Additionally, *The Wizard of Oz* causes many a small child to have nightmares after watching it for the first time, but obviously this level of emotional trauma is not the concern of the neglect statute.

Of the numerous cases that have addressed the sufficiency of the evidence for a child neglect conviction, most have involved fact patterns relating to a failure to seek medical care for an injured or ill child. For example, in *Smith v. State,* 718 N.E.2d 794, 806–07 (Ind.Ct.App.1999), *trans. denied,* we held there was sufficient evidence to support a neglect conviction where a mother failed for forty-eight hours to seek medical attention for her nine-month old's skull fracture where the child had obvious, visual signs of injury and eventually died. By contrast, in *Fout v. State,* 619 N.E.2d 311, 313–14 (Ind.Ct.App. 1993), we held there was insufficient evidence to support a mother's neglect conviction where she failed for twenty-four hours to seek medical treatment for her infant, but the only symptoms of illness were refusal to breastfeed and only drinking water and the mother had not been advised that these could be symptoms of a strep infection. Another case in which we found insufficient evidence to support a neglect conviction is *Ricketts v. State,* 598 N.E.2d 597, 601 (Ind.Ct.App.1992), *trans. denied,* where the defendant's dependents were malnourished but the State did not introduce evidence that they were so malnourished that their life or health was at

risk. Other facts that have been held to support a neglect conviction include knowingly exposing a child to illegal drug use or drug dealing, *see White v. State*, 547 N.E.2d 831, 836 (Ind.1989) *and Cleasant v. State*, 779 N.E.2d 1260, 1262–63 (Ind.Ct. App.2002); leaving small children alone in a bathtub, *see Howard v. State*, 481 N.E.2d 1315, 1317 (Ind.1985); knowingly exposing minors to inappropriate sexual activity by others, *see Harrison*, 644 N.E.2d at 891; leaving a small child alone in a house for several hours, *see Thames v. State*, 653 N.E.2d 517, 517 (Ind.Ct.App.1995); and driving while intoxicated and recklessly with an unrestrained child in the car, *see Kellogg v. State*, 636 N.E.2d 1262, 1265–66 (Ind.Ct.App.1994).

■ The facts of this case are unlike those in any reported decision. We believe this case is much more similar to those in which there was insufficient evidence to support a neglect conviction than the examples of egregious conduct that were sufficient to do so. Here, the undisputed evidence is that Gross and Hartman taped their children as part of a game that they enjoyed playing. Also, Gross and Hartman would remove the tape from the child at the child's request if he or she were unable to break free from it. There is no evidence in this case that Gross and Hartman bound the children as punishment or to confine the children as a babysitting technique. We also observe that the State did not charge Hartman and Gross under subsection (a)(2) of Section

35–46–1–4, which criminalizes "cruelly" confining a dependent.

The State posits that binding the children placed them at risk of physical injury because they would be more likely to fall over and hurt themselves when their ankles and/or wrists were taped together.[3] This may be true, but anyone who has taught a child to ride a bike realizes that the child will likely fall over many times and sustain slight scratches, scrapes, and bruises before being able to maintain his or her balance. The State also contends the children suffered mental distress because of the taping, pointing to the father's testimony that C.H. and B.H. currently are in counseling, have frequent nightmares, and have to sleep with a nightlight. There is no expert testimony, however, that connects the children's nightmares or any other mental distress with the taping incidents. Although the so-called "hostage" game strikes us as somewhat bizarre and not something many child development experts would condone, we conclude there is insufficient evidence that playing the game exposed B.H. and C.H. to a substantial, actual, and appreciable risk of mental or physical harm. Furthermore, given the circumstances of this case—that the taping was viewed as a game by Gross, Hartman, and the children, and that the tape would be removed if the children requested it—there is insufficient evidence that Gross and Hartman were subjectively aware of a high probability that B.H. and C.H. were endangered by the taping.

**3.** The State also contends that it was inherently dangerous to allow B.H. to sit in the stroller because it was old and was going to be thrown away. However, the State presented no evidence at trial that the stroller was unsafe for B.H. to sit in. The State also directs us to the testimony of C.H.'s grandmother, who related C.H.'s comment that she did not want tape over her mouth. This hearsay statement, which was related during cross-examination and not in direct response to a question by defense counsel, does not indicate that tape was in fact placed over C.H.'s mouth. Additionally, the State charged Hartman and Gross with taping her hands and feet only and never asserted that any other type of binding took place.

Was the taping of the children more extensive than described and was it done with a more malevolent intent than the mere playing of a game? There was no evidence presented that would support such a conclusion. The testimony of all the State's witnesses, all of Hartman's and Gross' witnesses, and Hartman's and Gross' pretrial statements to police were consistent in describing the taping "game." A conviction cannot be based on speculation. *See Bunting v. State,* 731 N.E.2d 31, 35 (Ind.Ct.App.2000), *trans. denied.* "Any consideration and determination of the jury is to be made on the evidence presented to them. Imagination or speculation is not a proper basis for presenting evidence nor for analyzing it or reaching conclusions based on it." *Hoskins v. State,* 441 N.E.2d 419, 426 (Ind.1982).

### Conclusion

There is admittedly a fine line between properly exercising the police power to protect dependents and improperly subjecting every mistake a parent may make in raising his or her child to prosecutorial scrutiny. In this particular case, whether Gross' and Hartman's playing the "hostage" game with children requires the involvement of a child welfare office is something we need not decide, but we are confident that this does not support a criminal conviction for neglect of a dependent. We reverse all four convictions on the basis of insufficient evidence.

Reversed.

NAJAM, J., and SULLIVAN, J., concur.