## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 14 2017, 8:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen F. Hurley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Darrell Daniels,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 14, 2017

Court of Appeals Case No.
49A02-1703-CR-522

Appeal from the Marion Superior Court

The Honorable Marc T. Rothenberg, Judge

Trial Court Cause No.
49G02-1307-FA-46959

**Robb, Judge.**

# Case Summary and Issue

[1] Following a bench trial, Darrell Daniels[1] was convicted of Class A felony neglect of a dependent. Daniels appeals, raising the sole issue that the evidence was insufficient to prove that the child was in his care, that he placed the child in a situation that endangered her life, or that he knew the child required medical attention. Concluding the State presented sufficient evidence to support the conviction, we affirm.

# Facts and Procedural History

[2] On the morning of May 4, 2013, an ambulance was dispatched to a home in Marion County, Indiana, regarding a report of cardiac arrest. Upon entry, paramedics found the lifeless body of a fifteen-month-old girl. The girl, A.S.-D., was not breathing, unresponsive, and cold to the touch. In addition to post-mortem rigor mortis and liver mortis, paramedics noted the body had visible bruises on the head, face, torso, and stomach.

[3] Daniels lived at the small duplex along with his girlfriend, Nikita Dunn. Dunn moved in two months prior, followed by her two children, including then fourteen-month-old A.S.-D. Daniels was also regularly visited by his two young children from a prior marriage.

---

[1] We note the Appellant's name is "Darrell Daniels" not "Darrell Daniel" as this court's docket and some trial court documents incorrectly indicate.

[4] Daniels recounted the events surrounding A.S.-D.'s death during two interviews with police on May 4 and May 6, 2013. During the first interview, Daniels attributed A.S.-D.'s bruising to falling out of her playpen and the fact she was recently hit in the eye with a hairbrush by her sister. Daniels stated the evening before A.S.-D.'s death, he had watched her while Dunn ran errands, gave his two children a shower, and cooked hotdogs for dinner. When the children went to bed around 10:00 or 10:30 p.m., A.S.-D. was put to bed on the couch because she had recently learned how to climb out of her crib.

[5] Daniels recalled on the morning of May 4, he played a video for his children and gave them cereal, believing A.S.-D. was still asleep on the couch. Dunn and Daniels showered and when Dunn returned to the living room, she screamed Daniels' name. Daniels said he ran to the living room to find A.S.-D. not breathing, stiff and cold. He told Dunn to call 9-1-1 and began CPR, moving A.S.-D. to the floor.

[6] An autopsy revealed A.S.-D. had numerous injuries. Externally, A.S.-D. suffered from abrasions on her head; a contusion underneath her right eye; a laceration and torn frenulum inside her mouth; several small contusions on her torso, abdomen and head; a burst vein on the left side of her temple; and hemorrhaging to the white of her right eye. Dr. Brewer-Paul, the forensic pathologist who performed the autopsy, explained that the injuries inside A.S.-D.'s mouth could be explained by the child biting her own lip or some other blunt force that pushed her lip against her tooth. The contusions on her

torso, abdomen and head were also likely the result of blunt force, some of which Dr. Brewer-Paul believed to have been at least three days old.

[7] Internally, A.S.-D. had cerebral edema (swelling of the brain), subgaleal hemorrhaging (bleeding inside the scalp), an injury to the dura (the fibrous layer covering the brain), hematoma of the liver (bleeding of the liver), mesenteric hemorrhaging (bleeding of the layer of fat that covers the abdominal organs), and hemorrhages within the pancreas, peripancreatic tissue, and diaphragm. Based on the existence of a blood-clot in the peritoneal cavity, Dr. Brewer-Paul believed there was bleeding inside the abdominal cavity for three to four days, thereby allowing time for the blood to clot. She concluded that A.S.-D. died six to eight hours before paramedics arrived as the result of multiple blunt force traumatic injuries and if the child had received medical attention, she "[v]ery likely" would have survived. Transcript, Volume II at 65.

[8] Daniels was confronted with the results of the autopsy in his second interview with police. He stated that in the two weeks preceding A.S.-D.'s death, no other adult besides he and Dunn were alone with A.S.-D. When shown photographs of A.S.-D. depicting bruising on her torso, Daniels repeated he believed the bruises were the result of A.S.-D. falling out of her playpen or from learning to walk. Upon further questioning, however, Daniels admitted A.S.-D. must have been abused by Dunn because they were the only ones who had been alone with the child in the preceding weeks but stated he never witnessed it.

[9] At trial, the State presented testimony from Dr. Harris, a pediatrician specializing in child abuse. Dr. Harris testified that A.S.-D.'s bruising was excessive for a toddler of her age and "A typical [sic] for an accidental injury." Tr., Vol. II at 88. She explained that newly-walking toddlers sometimes bruise their foreheads but bruises are uncommon on the sides of the head. She rejected the contention that A.S.-D.'s abdominal injuries were the result of a fall from her playpen because the abdomen is not easily bruised and when children fall from a height, they are much more likely to injure their forehead or a limb. Dr. Harris also noted that although a hairbrush could have caused bruising, it would only account for one of the contusions on A.S.-D.'s face.

[10] According to Dr. Harris' testimony, A.S.-D. would have exhibited various symptoms visible to an adult caretaker. The injury to A.S.-D.'s head may have caused her to lose consciousness, develop seizures, begin vomiting, and decreased her activity and appetite. The injury to A.S.-D.'s abdomen would have been very painful and caused her to indicate pain. Typically, Dr. Harris explained, children with similar abdominal injuries are very thirsty but experience vomiting and a loss of appetite. In Dr. Harris' opinion, A.S.-D.'s abdominal injuries were less than a week old and the head injuries occurred within forty-eight to seventy-two hours before her death.

[11] The State charged Daniels with neglect of a dependent by placing A.S.-D. in a situation that endangered her life or health as a Class A felony because it resulted in death. After a bench trial, the trial court found Daniels guilty as charged. Daniels now appeals his conviction.

# Discussion and Decision

## I. Standard of Review

[12] Our standard of review upon a challenge to the sufficiency of the evidence is well established: we do not reweigh the evidence or judge the credibility of witnesses. *McHenry v. State,* 820 N.E.2d 124, 126 (Ind. 2005). We examine only the probative evidence and reasonable inferences therefrom that support the conviction. *Lock v. State,* 971 N.E.2d 71, 74 (Ind. 2012). "[W]e affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004).

## II. Sufficiency of the Evidence

[13] The statute defining neglect of a dependent states:

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
>
> > (1) places the dependent in a situation that endangers the dependent's life or health;
> >
> > * * *
>
> commits neglect of a dependent, a Class D felony.
>
> (b) However, the offense is:

* * *

> (3) a Class A felony if it is committed under subsection (a)(1) . . . by a person at least eighteen (18) years of age and results in the death of a dependent who is less than fourteen (14) years of age;

Ind. Code § 35-46-1-4(a)(1), (b)(3) (2012).

[14] Daniels contends that the evidence was insufficient to prove that A.S.-D. was in his care, that he placed A.S.-D. in a situation that endangered her life, or that he knew A.S.-D. required medical attention.

## A. Voluntary Assumption of Care

[15] To convict Daniels, the State first had to prove that Daniels was "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation . . . ." Ind. Code § 35-46-1-4(a).

[16] A "dependent" for the purposes of this statute means either "(1) an unemancipated person who is under eighteen (18) years of age; or (2) a person of any age who has a mental or physical disability." Ind. Code § 35-46-1-1. Because Daniels was not A.S.-D.'s parent or legal guardian, he had no legal obligation to provide care for A.S.-D. *Cf. Kellogg v. State,* 636 N.E.2d 1262, 1264 (Ind. Ct. App. 1994) (noting "[p]roof that the defendant is the parent or legal guardian of the dependent establishes care 'because of a legal obligation'"). The State therefore had to prove that Daniels had assumed a voluntary obligation. Whether a child is a "dependent" is a question of fact.

*State v. Springer,* 585 N.E.2d 27, 30 (Ind. Ct. App. 1992), *trans. denied.* Our review reveals sufficient evidence to support the fact-finder's conclusion that Daniels voluntarily assumed care of A.S.-D.

[17] In *Dowler v. State*, 547 N.E.2d 1069 (Ind. 1989), a fifteen-month-old child resided with his father and two other men who would often care for the child when his father was gone. After the child died of injuries similar to those presented here, the defendant, one of the two men residing with the child's father, was charged with neglect of a dependent. *Id.* at 1070. The record established the defendant fed, bathed, watched, and disciplined the child but the child's father testified the defendant did not have care of the child. *Id.* at 1070, 1072. Our supreme court held that evidence the defendant cared for the child sometimes at the request of the child's father and sometimes voluntarily because no one else would care for him was sufficient to establish the defendant had assumed responsibility for the child. *Id.* at 1072.

[18] Although A.S.-D. had only been living in Daniels' home for a month, there is ample evidence that Daniels assumed her care. Daniels rented the property that he allowed Dunn and her two children to move into. The record reveals that Daniels would often watch Dunn's children and that he cooked for the children and changed their diapers. On the evening before A.S.-D.'s death, Daniels watched the children while Dunn ran errands and cooked them dinner. This evidence is sufficient to establish Daniels assumed responsibility for A.S.-D.

[19] Daniels argues there "was evidence of a clear delineation of care between Daniels and Dunn regarding their respective children[,]" because they bathed and disciplined their own children. Brief of Appellant at 14. This argument is merely an invitation to reweigh the evidence which we cannot do.

## B. Knowing Endangerment

[20] Daniels next contends that he did not knowingly place A.S.-D. in a situation that endangered her life or health. Having established above that Daniels voluntarily assumed A.S.-D.'s care, Indiana Code section 35-46-1-4(a)(1) requires proof he knowingly or intentionally placed A.S.-D. in a situation that endangered her life or health. Whether a dependent was placed in a situation endangering his or her life or health is a question of fact. *Kerlin v. State,* 573 N.E.2d 445, 448 (Ind. Ct. App. 1991), *trans. denied.*

[21] An accused acts knowingly if he was "subjectively aware of a high probability that he placed the dependent in a dangerous situation." *Gross v. State,* 817 N.E.2d 306, 308 (Ind. Ct. App. 2004) (quotation omitted); *see also* Ind. Code § 35-41-2-2(b). Because such a finding requires the fact-finder to infer the defendant's mental state, "this Court must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper." *Villagrana v. State,* 954 N.E.2d 466, 468 (Ind. Ct. App. 2011).

[22] The State presented circumstantial evidence from which a fact-finder could conclude Daniels was subjectively aware of a high probability that he placed A.S.-D. in a dangerous situation. Daniels observed multiple bruises on A.S.-D.

throughout the time they lived together, beginning with a large bruise on A.S.-D.'s cheek when she first moved in. When Daniels was shown photographs of the bruising on A.S.-D.'s torso, which the detective described as fist-shaped, Daniels recalled that there were similar bruises that had already disappeared. Finally, on the morning of A.S.-D.'s death, paramedics immediately noticed bruises "on her head and her face and her torso and her belly." Tr., Vol. II at 10. The State presented testimony that the contusions were at least three days old, and along with the other external injuries to A.S.-D., these injuries would have been visible prior to A.S.-D.'s death.

[23] Moreover, the State presented testimony of a litany of symptoms that would have been displayed before A.S.-D.'s death, all of which would be detectable by an adult caretaker. Among them, Dr. Harris listed a loss of consciousness, seizures, vomiting, increased thirst, and a decrease in activity and appetite. We are not, of course, suggesting that the failure to detect the slightest symptom exposes a caregiver to criminal liability. Rather, the facts presented here are sufficient for a fact-finder to determine that either Daniels abused A.S.-D. himself or by way of observing external injuries, the manifestation of symptoms, and the circumstances under which they occurred, Daniels knew with a high probability that A.S.-D. was in a dangerous situation due to abuse by others.

[24] Daniels argues that even if he was aware of A.S.-D.'s dangerous situation, he had no authority to separate her from her mother. In support of his argument, Daniels relies heavily on *Fisher v. State*, 548 N.E.2d 1177 (Ind. Ct. App. 1990).

There, the defendant allowed a mother and her child to stay at his residence. Although the evidence established the mother was beating the child, the State argued that the Defendant knew and committed neglect by leaving "the defenseless child to be beaten to death by its mother." *Id.* at 1179. This court reasoned the evidence was sufficient to establish the defendant had voluntarily assumed care of the child but he did not place the child in the situation and had no authority to remove the child. *Id.* at 1179-80. In doing so, the court explained that the failure to report child abuse was a separate offense and was insufficient to establish neglect of a dependent. *Id.* at 1180.

[25]    Conversely, in *Dowler v. State*, as discussed above, a fifteen-month-old child died at the hands of his father's two roommates. 547 N.E.2d at 1069. The defendant appealed his conviction of neglect of a dependent, arguing that he did not place the child in the situation and that he lacked the authority over him. *Id.* at 1071-72. In holding there was "more than sufficient evidence" to support the jury's verdict, our supreme court reasoned that, "the statute does not limit its coverage to those acting only with authority or permission but provides one having the care of a dependent whether assumed voluntarily or because of a legal obligation." *Id.* at 1072.

[26]    The distinguishing factor between *Fisher* and *Dowler* is that in *Fisher* the custodial parent was known to be the abuser and there was no evidence the defendant actively participated in the abuse. Conversely, in *Dowler*, there was evidence supporting a finding the defendant himself either perpetrated or observed the violence done to the child while he was in the defendant's care.

Here, the evidence shows only Daniels and Dunn cared for A.S.-D. in the last weeks of her life, and Daniels was the last person to provide care for her before she was found unresponsive and seriously injured. This evidence was sufficient for the fact-finder to determine that Daniels either abused A.S.-D. himself or was complicit in her abuse beyond merely failing to report and therefore knowingly placed A.S.-D. in a situation that endangered her life or health.

## C. Failure to Seek Medical Attention

Lastly, Daniels argues "there is insufficient evidence to show Daniels knew [A.S.-D.] required emergency medical attention such that he should have called 911." Br. of Appellant at 17. "When the allegation of neglect is the failure to provide medical care, the State must show that the need for medical care was actual and apparent and the accused was actually and subjectively aware of that need." *Taylor v. State,* 28 N.E.3d 304, 307 (Ind. Ct. App. 2015), *trans. denied.* This, too, is a question of fact. "It is within the legitimate province of the trier [of fact] to infer from the totality of the circumstances whether or not the requisite awareness was present, and whether or not the action of the [person] was reasonable." *Smith v. State,* 408 N.E.2d 614, 621 (Ind. Ct. App. 1980).

We note that the law does not require the danger to a dependent to require calling 9-1-1 or seeking emergency medical attention. The danger to the dependent must only be "actual and appreciable." *Gross,* 817 N.E.2d at 309. "When there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the [fact-finder] to infer that the defendant knowingly neglected the dependent."

*Mitchell v. State,* 726 N.E.2d 1228, 1240 (Ind. 2000), *abrogated on other grounds by Beattie v. State,* 924 N.E.2d 643 (Ind. 2010). However, Daniels argues that since "[h]e had no authority to take the child to a doctor," A.S.-D.'s medical condition must have been severe enough to necessitate calling 9-1-1. Br. of Appellant at 20 (citing *Fisher,* 548 N.E.2d at 1180 ("Fisher did not have the authority to separate [the child and mother].")).

[29] Although Daniels is correct in asserting he could not separate Dunn and A.S.-D., there was sufficient evidence to conclude that A.S.-D.'s need for medical care was actual and appreciable such that Daniels was subjectively aware of the need. The State presented testimony that, in addition to the many external injuries Daniels observed over a period of weeks and which alone were sufficient to have sought medical treatment, A.S.-D. would have displayed any number of alarming symptoms associated with her internal injuries. This, of course, is assuming the injuries were inflicted only by Dunn, not Daniels. However, as we concluded above, the evidence was sufficient for the fact-finder to determine that Daniels either abused A.S.-D. himself or actively facilitated A.S.-D.'s abuse. The evidence clearly supports a finding that Daniels was subjectively aware of A.S.-D.'s need for medical care.

# Conclusion

[30] For the reasons set out above, we conclude the State presented sufficient evidence to support Daniels' conviction. Daniels' conviction for neglect of a dependent is therefore affirmed.

[31] Affirmed.

Riley, J., and Pyle, J., concur.