## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

FILED

Feb 08 2018, 5:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Frederick A. Turner
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robierre Jomokenya McNeil, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | February 8, 2018 <br><br> Court of Appeals Cause No. 53A05-1707-CR-1750 <br><br> Appeal from the Monroe Circuit Court <br><br> Trial Court Case No. 53C09-1606-F1-462 <br><br> The Honorable Teresa D. Harper, Judge |

**Riley, Judge.**

# STATEMENT OF THE CASE

[1] Appellant-Defendant, Robierre McNeil (McNeil), appeals his conviction and sentence for aggravated battery resulting in the death of a child less than fourteen years of age, a Level 1 felony, Ind. Code § 35-42-2-1.5; and neglect of a dependent, a Level 6 felony, I.C. § 35-46-1-4.

[2] We affirm.

# ISSUES

[3] McNeil presents two issues on appeal, which we restate as:

(1) Whether there was sufficient evidence beyond a reasonable doubt to support McNeil's convictions; and

(2) Whether McNeil's sentence is inappropriate in light of the nature of the offenses and his character.

# FACTS AND PROCEDURAL HISTORY

[4] In 2016, Laura Crum (Crum), housed Cy'Nario Smith-Barton (Smith-Barton) and Smith-Barton's two daughters—three-year old A.B., and two-year old R.B.—in her two-bedroom apartment in Bloomington, Indiana. McNeil is the biological father to A.B. and R.B. McNeil and Smith-Barton were expecting their third daughter, K.S-B., who was born on March 29, 2016. At the time K.S-B was born, McNeil was not residing at Crum's apartment since he did not get along well with Crum.

[5] On May 20, 2016, Crum went on vacation for about a week. In light of Crum's absence, Smith-Barton sought help from McNeil to care for their daughters while she went to work. McNeil temporarily moved into Crum's apartment and took up a primary role in caring for his three daughters. Also residing at Crum's apartment was Smith-Barton's mother, Melzina Nash (Melzina) and husband, Tyrone Nash (Tyrone). The record shows that Crum and her eleven-year-old daughter, A.C., slept in one bedroom; Melzina and Tyrone slept in the other bedroom; and Smith-Barton and McNeil, together with their three daughters, slept in the living room.

[6] On Memorial Day, May 29, 2016, shortly before 7:00 a.m., Smith-Barton was woken up by her two-month old daughter, K.S-B. After feeding K.S-B., she put her back in her mechanical swing, and Smith-Barton informed McNeil that she was leaving for work. At around 9:00 a.m., Tyrone woke up. Tyrone and Melzina had planned on tackling their laundry first thing in the morning at the laundromat; however, Melzina wanted to sleep in since she had worked the previous night with her shift ending at 6:00 a.m. Shortly after getting out of bed, Tyrone went to the kitchen to get some water. Tyrone observed that McNeil and his three daughters—A.B., R.B., and K.S-B., were all asleep in the living room. Tyrone went back to his bedroom and remained there until Melzina woke up sometime before 11:00 a.m. After Tyrone and Melzina got ready, they loaded their vehicle with dirty laundry and the couple left.

[7] At around 10:45 a.m., Crum arrived home after working through the night. The air-conditioning was turned off, so she took the remote and switched it on.

Crum observed that McNeil and his daughters were all asleep. Crum proceeded to her bedroom, and after a failed attempt of kicking out A.C. from her bed, she laid down and slept. Shortly before noon, A.C. went outside with her phone to record herself singing. A.C. was outside for about an hour, and when she came back inside, she got a sandwich and went into the room she shared with Crum to watch a couple of Netflix shows. After about forty minutes, A.C. went back to the living room. By that time, A.B., R.B., and McNeil were awake. However, K.S-B. remained asleep in her mechanical swing. Then at approximately 1:00 p.m., Melzina and Tyrone returned to the apartment to drop off some groceries and a kiddie pool for A.B. and R.B. Soon after, Melzina and Tyrone left for the laundromat. At nearly 2:00 p.m., McNeil recruited help from A.C. to fill up the kiddie pool. McNeil watched A.B. and R.B. while they played in the kiddie pool, and A.C. was on her phone watching YouTube videos. Inside the apartment, K.S-B. remained asleep in her mechanical swing, and Crum was in her bedroom sleeping.

[8] At about 4:00 p.m., Smith-Barton arrived home from work. A.B. and R.B. were outside playing in the kiddie pool. When Smith-Barton went inside the apartment, she found K.S-B. swaddled in her blanket and asleep in her swing. Not wanting to wake her up, Smith-Barton kissed K.S-B. on her forehead and then went back outside. McNeil informed Smith-Barton that he wanted to leave to go to a friend's house to record music. Smith-Barton informed McNeil that he could not leave since she was returning to work at around 5:00 p.m.

Before going back to work, Smith-Barton passed by the laundromat, which was about a block from the apartment, to borrow a cigarette from Melzina.

[9] Just before 4:45 p.m., McNeil actively checked on K.S-B., but she was unresponsive. McNeil took K.S-B. into Crum's room and informed Crum that K.S-B. was not breathing. Crum unwrapped the blanket around K.S-B., and although K.S-B. was warm, she was unresponsive. Crum called 9-1-1 and Melzina. Upon receiving the devastating news, Smith-Barton, Melzina and Tyrone all rushed back to the apartment. The Bloomington Police Department and Fire Department were first to arrive. Dan Emerick (Emerick), a fire fighter and an EMT, noticed that although K.S-B. was still warm, she did not have a pulse. Emerick attempted CPR on K.S-B. for about a minute to no avail. Moments later, the ambulance arrived, and the paramedics attempted CPR and ventilations on K.S-B. on the way to the hospital, arriving at approximately 5:00 p.m. Attempts to restart K.S-B.'s heart failed and she was pronounced dead at 5:31 p.m.

[10] Meanwhile at the apartment, Officer Dustin Kruse (Officer Kruse) was in the living room and his body camera had been activated. McNeil was recorded talking to his mother and he repeatedly stated, "[I]it is my fault . . . now [K.S-B.] is gone and it is my fault. . . it is my fucking fault." (State's Exh. 5 at 47:16). McNeil additionally stated, "[O]bviously it is my fault. I personally know it is my fault . . . it is nobody else's fault but mine because I was the only one here to watch [K.S-B.]" (State's Exh. 5 at 1:03, 1:05). McNeil was later detained.

[11] On June 6, 2016, McNeil expressed to the jail officials that he wanted to speak to the investigating officer in order to narrate the events of the day K.S-B. died. Prior to a recorded interview, McNeil was read his *Miranda* rights and he signed a waiver form. McNeil started off by saying that on May 29, 2016, between 7:00 a.m. and 9:00 a.m., he was half asleep when he picked up K.S-B. from her mechanical swing. McNeil reported that while he walked toward the kitchen, he tripped and fell with K.S-B. on his left side. By his own admission, McNeil stated that K.S-B.'s head "did hit the floor" and she cried from the fall. (State's Exh. 17 at 15:33). McNeil praised himself for consoling K.S-B. He further expressed that he changed K.S-B.'s diaper, fed her, and then put her back in the swing. McNeil articulated that he did not believe K.S-B. required any medical attention after the fall, even though K.S-B.'s breathing had reformed into a snore. McNeil recounted that the next time he checked on K.S-B. was around 2:00 p.m. before going outside with his two daughters, A.B. and R.B., to play in the kiddie pool. According to McNeil, K.S-B. was breathing; however, he did not wake her up or feed her. The last time McNeil checked on K.S-B. was around 4:45 p.m., but K.S-B. was unresponsive. Following his interview, the State filed an Information, charging McNeil with Count I, aggravated battery resulting in the death of a child less than fourteen years of age, a Level 1 felony; and Count II, neglect of a dependent resulting in death, a Level 1 felony.

[12] A four-day jury trial began on March 3, 2017, and concluded on March 8, 2017. During the trial, forensic pathologist Dr. Ronald Kohr (Dr. Kohr) testified for the State about the autopsy he had performed on K.S-B. Dr. Kohr affirmed that

K.S-B.'s cause of death was a blunt force trauma to the head, with the manner of death being homicide. Dr. Kohr found three separate contusions on K.S-B.'s head, and he opined that three contusions, as opposed to one, suggested that K.S-B.'s head injury was non-accidental. Dr. Kohr noted that K.S-B. had a significant fracture in the posterior left parietal bone, and a similar fracture was present in the right parietal bone. K.S-B. had also suffered a subdural and subarachnoid hemorrhage, all of which Dr. Kohr concluded to be the result of trauma. Dr. Kohr noted that victims who suffer from a subdural and subarachnoid hemorrhage may display a "loss of consciousness, generally, [] within a very short time . . . we may see interruptions of the normal breathing, . . . breathing will eventually become very slow, can be labored, can result in snoring type respirations," and breathing "would eventually stop. . . all together. (Tr. Vol. IV, p. 167). When asked to give a time frame for K.S-B.'s head injury, Dr. Kohr first explained that a contusion which causes blood vessels to rupture under the skin, will "go through various color changes, [] a very fresh bruise will be red because the blood is well oxygenated and oxygenated blood tends to be bright red." (Tr. Vol. IV, p. 145). He added that "[a]s the bruise ages and the oxygen level decreases and is absorbed into the tissues, it will go more of a bluish-purple. [] as it ages further, the chemicals in the, [] hemoglobin start to break down and go from being a reddish-blue to purple to more of a green." (Tr. Vol. IV, p. 145). Dr. Kohr opined that the hemorrhaging displayed on K.S-B.'s head was "fairly fresh" since the blood appeared "reddish-blue to reddish-purple." (Tr. Vol. IV, p. 146). Dr. Kohr also testified that K.S-B.'s stomach was empty, which was suggestive that K.S-B.

had not been fed for "at least 7 ½ -9 hours. . . . a child this age do[es] not go that long between feeding which tells me that someone was not paying due diligence to this child." (Tr. Vol. IV, p. 176).

[13] Dr. Shannon Thompson (Dr. Thompson), a board-certified child abuse pediatrician for Riley Hospital for Children also testified for the State regarding K.S-B.'s autopsy report. She stated that K.S-B.'s injury was representative of abusive head trauma. She stated that K.S-B. had "three different areas of hemorrhage . . . to both sides of the top of her head. . . and additional hemorrhage, [] to the back" of her scalp. (Tr. Vol. IV, p. 206). She indicated that the multiple areas of hemorrhage would have likely been caused by "at least three impacts" to the head. (Tr. Vol. IV, p. 206). Dr. Thompson determined that fracture on the left side of K.S-B.'s skull was "more significant." (Tr. Vol. IV, p. 198). Dr. Thompson also ruled out K.S-B.'s trauma being accidental, and she noted that a victim who has suffered an accidental head trauma would have a "simple skull fracture, I mean one fracture" and not "multiple skull fractures" as witnessed in K.S-B.'s autopsy. (Tr. Vol. IV, pp. 200-201). She additionally stated that in accidental head trauma cases, "you may have a small, tiny, oval area of bleeding," and the hemorrhaging would not be as extensive in both the "subdural and subarachnoid area, [it] is just not something we see typically with accidental" head injuries. (Tr. Vol. IV, p. 202). Dr. Thompson conveyed that infants who have had a "significant brain injury" would "immediately probably look different." (Tr. Vol. IV, p. 207). "So, if they were crying" they would "stop

crying," breathing may transform into a snore, and the brain would get less oxygen over time. (Tr. Vol. IV, p. 208). She added that due to diminished levels of oxygen, the brain may lose its ability to regulate "blood flow" and "pressure" and eventually, "the cells start to die." (Tr. Vol. IV, p. 208). She testified that an infant who has suffered a brain injury will typically become irritable, they may have seizures, they may "hypo-ventilate" and may "stop breathing all together." (Tr. Vol. IV, p. 208). Dr. Thompson placed the time of K.S-B.'s head trauma between 7:00 a.m. and 9:00 a.m. on May 29, 2016, when K.S-B. was awake and normal to tolerate any feedings.

[14] At the close of the evidence, the jury returned guilty verdicts for Count I, aggravated battery resulting in the death of a child less than fourteen years of age, a Level 1 felony; and Count II, neglect of a dependent resulting in death, a Level 1 felony. On April 20, 2016, the trial court conducted a sentencing hearing and imposed a sentence of forty years for the aggravated battery conviction. To avoid double jeopardy concerns, the trial court entered a judgement of conviction for the Level 1 felony neglect of a dependent conviction as a Level 6 felony, and then sentenced McNeil to a two and one-half years, all to be served concurrently in the Department of Correction.

[15] McNeil now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Sufficiency of the Evidence*

McNeil contends that the evidence is insufficient to sustain his convictions for aggravated battery, a Level 1 felony, and neglect of a dependent, a Level 6 felony. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id*. We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id*.

## A. *Aggravated Battery*

Indiana Code section 35-42-2-1.5 provides that "[a] person who knowingly or intentionally inflicts injury on a person that creates a substantial risk of death . . . commits aggravated battery, a Level 3 felony. However, the offense is a Level 1 felony if it results in the death of a child less than fourteen (14) years of age and is committed by a person at least eighteen (18) years of age." McNeil argues that "[t]here is no evidence, even cumulatively, that allows for a reasonable inference that [he] struck [K.S-B.] with . . . a blunt force to have caused two fractures, contusions, and brain hemorrhaging. All that was proven is suspicion and opportunity." (Appellant's Br. p. 13).

[18] McNeil analogized his case to *Howard v. State*, 162 Ind.App. 487, 319 N.E.2d 849, 850 (1974). In *Howard*, in reversing the defendant's conviction for cruelty and neglect of a child, we held that: "The evidence most favorable to the State merely discloses that the injuries to [the victim's] head and abdomen occurred between 12 and 24 hours prior to his hospitalization. During that period, [the victim] was under the control of several persons other than [the defendant]" and that "[a]t most, the evidence shows that [the defendant] among others had an opportunity to inflict the injuries to [the victim's] head and abdomen." *Id.* at 851-852.

[19] The evidence presented against the defendant in *Howard* is distinguishable from the evidence presented in this case, and we do not find *Howard* instructive. Indeed, McNeil ignores the substantial evidence the State presented showing that he had exclusive control and care of K.S-B. on the day K.S-B. sustained her fatal head injury, which resulted in her death.

[20] On the day K.S-B. died, she was eight weeks old; McNeil was thirty-four. On that morning, Smith-Barton fed K.S-B., and at about 7:00 a.m., she informed McNeil that she was leaving for work. Although there were other residents living in the apartment, there was uncontroverted evidence that McNeil was the sole caregiver to K.S-B. between 7:00 a.m. and 4:45 p.m. Specifically, during a recorded interview, McNeil informed the investigating officer that he was responsible for K.S-B.'s care on that day. McNeil articulated that the only way K.S-B.'s head could have been injured was when he fell on his left side with K.S-B. while walking toward the kitchen. Dr. Thompson determined that the

fracture on the left side of K.S-B.'s skull was "more significant." (Tr. Vol. IV, p. 198). Although McNeil altered the version of events at his trial, indicating that he did not fall with K.S-B., McNeil reiterated that he exclusively attended to K.S-B.'s needs and care on the day she died. Both Dr. Kohr and Dr. Thompson concluded that K.S-B. was hit with significant force on her head on at least three different points, and the impacts ultimately caused two skull fractures and massive subdural and subarachnoid hemorrhaging. Both doctors consistently testified that the repeated impacts were representative of abusive head trauma and they excluded a theory of K.S-B.'s head injury being inadvertent. In addition, both doctors testified that there was a probability that K.S-B. would have become unconscious shortly after the trauma. Dr. Kohr noted that K.S-B. might have experienced interruptions in normal breathing, and her breathing may have been "labored" or altered into a "snoring type respiration." (Tr. Vol. IV, p. 167). Dr. Thompson conveyed that immediately after the head trauma, K.S-B. "may have tolerated a [feed] but she might have not taken as much or she would have seemed sleepy or she would have vomited. Something would have alerted" the caregiver that "something's different about her." (Tr. Vol. IV, p. 224).

[21] Although Smith-Barton testified that K.S-B. "slept all the time," she indicated that K.S-B. would wake up "maybe every 2 or 3 hours" to feed. (Tr. Vol. IV, pp. 101-102). McNeil did not attempt to wake or feed K.S-B. until 4:45 p.m. Dr. Thompson cited the likely time for the trauma was between 7:00 a.m. and 9:00 a.m., when K.S-B. may have been awake to tolerate any feeding.

Although Dr. Kohr was unable give a specific timeframe, he opined that hemorrhaging in K.S-B.'s head reflected that the trauma was "fairly fresh" since the blood appeared "reddish-blue to reddish-purple." (Tr. Vol. IV, p. 146).

[22] Here, the medical testimony established that K.S-B.'s head injury was only a few hours old, and K.S-B. would not have acted normally after the injury. The medical evidence additionally concluded that due to the multiple contusions on K.S-B.'s head, the injuries could not have been imposed accidentally, but by a "purposeful act." (Tr. Vol. IV, p. 223). The evidence establishes that two-month-old K.S-B. was completely under McNeil's care when she sustained her life-threatening injuries to her head, and based upon our review of the evidence as set forth in the record and above, we conclude that sufficient evidence exists from which the jury could find McNeil guilty beyond a reasonable doubt of aggravated battery as a Level 1 felony.

## B. *Neglect of a Dependent*

[23] The statute defining the crime of neglect of a dependent provides:

> A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
>
> (1) places the dependent in a situation that endangers the dependent's life or health;
>
> (2) abandons or cruelly confines the dependent;

(3) deprives the dependent of necessary support; or

(4) deprives the dependent of education as required by law; commits neglect of a dependent, a Level 6 felony.

(b) However, the offense is:

****

(3) a Level 1 felony if it is committed under subsection (a)(1), (a)(2), or (a)(3) by a person at least eighteen (18) years of age and results in the death of a dependent who is less than fourteen (14) years of age

I.C. § 35-46-1-4.

[24] The jury found McNeil guilty of Level 1 felony neglect of a dependent. At sentencing, however, in order to avoid double jeopardy implications, the trial court entered a judgment of conviction for the Level 1 felony as a Level 6 felony. The charging Information alleged, in part, that McNeil "did knowingly place [K.S-B.] in a situation that endangered [her] life or health, to-wit: caused her to be injured and failed to get her medical care, which resulted in death." (Appellant's App. Vol. II, p. 16). We note that the 'resulting in death' is not an element for the Level 6 felony, and at a minimum, the State only needed to prove beyond a reasonable doubt that McNeil knowingly placed K.S-B. in a life-threatening situation by failing to seek necessary medical attention.

[25] McNeil argues that the State failed to prove that he "was actually and subjectively aware of a high probability that [K.S-B.] was in actual and

appreciable danger due to the blunt force trauma to her head" that necessitated immediate medical care. (Appellant's Br. p. 15). The State, in turn, contends that McNeil was aware that K.S-B. had been hurt from the fall, and she required medical treatment. The *mens rea* for the crime of neglect of a dependent is the defendant's "subjective . . . aware[ness] of a high probability that he placed the dependent in a dangerous situation." *Gross v. State*, 817 N.E.2d 306, 308 (Ind. Ct. App. 2004). The danger to the dependent must be "actual and appreciable." *Id*. at 309. Because such a finding requires the fact-finder to infer the defendant's mental state, "this [c]ourt must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper." *Villagrana v. State*, 954 N.E.2d 466, 468 (Ind. Ct. App. 2011).

[26]     McNeil makes several arguments and he begins by claiming that after he placed K.S-B. back in her swing between 7:00 a.m. and 9:00 a.m., she soundly slept all day. He points out that "any parent can tell you that you don't want to wake a sleeping baby." (Appellant's Br. p. 17). In support, he relies on Crum's testimony where she claimed K.S-B. had in the past slept "anywhere between four to five hours at times," and "sometimes even longer." (Tr. Vol. V, pp. 49-50). McNeil further states that other residents who lived at the apartment did not notice anything unusual with K.S-B. He directs us to Smith-Barton's testimony where she stated that when she arrived home from work that day, K.S-B. was warm, and when she kissed K.S-B. on the forehead, nothing seemed unusual with K.S-B. McNeil's ultimate argument, however, is that K.S-B. did

not exhibit any symptoms which would have prompted him to seek medical care for K.S-B. on the day she died.

[27] "A parent is charged with an affirmative duty to care for his or her child." *Lush v. State*, 783 N.E.2d 1191, 1197 (Ind. Ct. App. 2003) (citing *Mallory v. State*, 563 N.E.2d 640, 644 (Ind. Ct. App. 1990)). "Neglect is the want of reasonable care—that is, the omission of such steps as a reasonable parent would take, such as are usually taken in the ordinary experience of mankind . . . " *Id.* (quoting *White v. State*, 547 N.E.2d 831, 836 (Ind. 1989)). In the context of a neglect conviction resulting from the alleged failure to provide timely medical care, it has been established that "[w]hen there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the jury to infer that the defendant knowingly neglected the dependent." *Mitchell v. State*, 726 N.E.2d 1228, 1240 (Ind. 2000), *abrogated on other grounds*, 924 N.E.2d 643 (Ind. 2010). Ultimately, whether a parent's failure to provide medical care for an ailing child constitutes criminal neglect is a question for the jury to answer. *Lush*, 783 N.E.2d at 1198. We must simply determine whether their answer was reasonable. *Id.*

[28] By his own admission during a recorded interview, McNeil stated that he fell with K.S-B. between 7:00 a.m. and 9:00 a.m., he consoled K.S-B., changed her diaper, fed her, and then put her back in her mechanical swing. McNeil thereafter went back to sleep and woke up at around noon. At approximately 2:00 p.m., before going out to play with his two daughters, McNeil again checked on K.S-B., and according to him, K.S-B. was breathing and she seemed

okay. At about 4:00 p.m., when Smith-Barton arrived home from work, McNeil did not mention that K.S-B. had fallen and hit her head that morning, or that she had not been up since about 9:00 a.m. Dr. Kohr testified that an infant who was about K.S-B.'s age would require feeding every two to four hours, and once the "stomach empties, they tend to be hungry again" and they "wake up and cry." (Tr. Vol. IV, p. 169). Based on Dr. Kohr's testimony, K.S-B. would have been awake around noon for another feeding. Smith-Barton testified that K.S-B. "slept great. She slept all the time," however, she would wake up "maybe every 2 or 3 hours" to feed. (Tr. Vol. IV, pp. 101-102). In addition, Dr. Thompson expressed that after the injury, K.S-B. "may have tolerated a [feeding,] but she might have not taken as much or she would have seemed sleepy or she would have vomited." (Tr. Vol. IV, p. 224). Dr. Thompson indicated that McNeil would have been alerted by the fact that "something's different about [K.S-B.]" (Tr. Vol. IV, p. 224).

[29] Any reasonable parent in McNeil's position would have been alarmed by the fact their infant had not been fed in almost seven hours and had remained asleep for a protracted period. McNeil was subjectively aware that K.S-B. had injured her head from the supposed fall that morning, and he was in a position to understand that medical attention was needed since two-month-old K.S-B. had remained asleep and not eaten all day. Mindful of the evidence before us, we conclude that the State presented sufficient evidence beyond a reasonable doubt to support McNeil's conviction of neglect of a dependent as a Level 6 felony.

## II. *Sentencing*

[30]     McNeil claims that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) empowers us to independently review and revise sentences authorized by statute if, after due consideration, we find the trial court's decision inappropriate in light of the nature of the offense and the character of the offender. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, while the "character of the offender" permits a broader consideration of the defendant's character. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008); *Douglas v. State*, 878 N.E.2d 873, 881 (Ind. Ct. App. 2007). An appellant bears the burden of showing that both prongs of the inquiry favor a revision of his sentence. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224. Our court focuses on "the length of the aggregate sentence and how it is to be served." *Id*.

[31]     The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). For his Level 1 felony aggravated battery, McNeil faced a sentencing range of twenty to forty years, with the advisory sentence being thirty years. I.C. § 35-50-2-4. McNeil was sentenced to forty years, which is

the statutory maximum.  Secondly, for his Level 6 felony neglect of a dependent, McNeil faced a sentencing range of six months to two and one-half years, with the advisory sentence being one year.  I.C. § 35-50-2-7(b).  The trial court imposed a maximum sentence of two and one-half years.

[32]    The nature of McNeil's offenses in this case does not support appellate sentence revision.  As the caregiver at the time, McNeil's responsibility was to ensure the health and well-being of his daughter.  K.S-B. was only two months old; she depended on McNeil to meet all of her needs.  The record reveals that K.S-B.'s manner of death was a blunt force trauma to the head.  The autopsy also revealed that K.S-B.'s head had been hit on at least three different points.  The autopsy also found that K.S-B. had sustained two skull fractures and hemorrhaging to her brain.  K.S-B. was exclusively under McNeil's care on the day she sustained her head trauma, and he failed to obtain necessary medical care.

[33]    The character of the offender is found in what we learn of the offender's life and conduct."  *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011).  Included in the assessment of a defendant's character is a review of his criminal history.  *Garcia v. State*, 47 N.E.3d, 1249, 1251 (Ind. Ct. App. 2015).  Also, a record of arrests is relevant to a trial court's assessment of the defendant's character.  *Cotto v. State*, 829 N.E.2d 520, 526 (Ind. 2005).  McNeil's lengthy criminal history stems from numerous arrests and convictions in Virginia, New York, Washington DC, and Indiana.  McNeil's prior criminal convictions include carrying a concealed weapon, assault, battery, possession of marijuana, assault

on a law enforcement officer, disorderly conduct, trespassing, child molesting, intentional damage to a monument, and failing to register as a sex offender. Further, McNeil's prior contacts that did not result in convictions include assault, battery on a family member, possession of marijuana, possession of paraphernalia, and probation violations. In light of the foregoing, we decline to find that McNeil's sentence is inappropriate in light of the nature of the offenses and his character.

# CONCLUSION

[34] In sum, we conclude that there was sufficient evidence beyond a reasonable doubt to convict McNeil of his Level 1 felony aggravated battery and Level 6 felony neglect of a dependent convictions. We further conclude that McNeil's sentence is not inappropriate.

[35] Affirmed.

[36] Baker, J. and Brown, J. concur