FILED

Jan 25 2018, 10:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

John D. Plascak
Rensselaer, Indiana

Robert V. Monfort
Rensselaer, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Billy J. Burden,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | January 25, 2018<br><br>Court of Appeals Case No.<br>66A03-1706-CR-1298<br><br>Appeal from the<br>Pulaski Circuit Court<br><br>The Honorable<br>Michael Anthony Shurn, Judge<br><br>Trial Court Cause No.<br>66C01-1510-F6-93 |

**Kirsch, Judge.**

[1] Following a jury trial, Billy J. Burden ("Burden") was convicted of neglect of a dependent[1] as a Level 6 felony. On appeal, Burden raises two issues, the following of which we find dispositive: whether the State presented sufficient evidence to support the element of neglect, requiring that Burden knowingly placed the dependent in a position that endangered her life or health.[2]

[2] We reverse.

## Facts and Procedural History

[3] In the fall of 2015, Burden and a woman named Christina were in a relationship and lived together with Christina's two young children B.E. and K.E. Christina believed that Burden was the father of four-month old K.E.; yet, she wanted Burden to provide no care for either child, explaining, "I was their mother." *Tr. Vol. 3* at 40. Christina testified that she provided "clothing, shelter, and all of the necessities" for K.E., and when it came to medical care, Christina's decision was the "rule of the day." *Id.* K.E. was born with various health issues, and in the summer of 2015, she had heart surgery.

[4] On September 28, 2015, Burden was the front-seat passenger in a car driven along a Pulaski County road by his sister, Tiffany. Tiffany's child, A.K., was in the back, buckled into a car seat. Christina, B.E., and K.E. were also in the

---

[1] *See* Ind. Code § 35-46-1-4(a)(1).

[2] Burden also contends that the State's voir dire questions pertaining to a father's duty toward his injured child constituted prosecutorial misconduct that rose to the level of fundamental error. Because we reverse Burden's conviction on other grounds, we need not address this issue.

back seat. B.E. sat in the middle, with his seatbelt fastened, and Christina sat next to B.E. Christina held a car seat on her lap, and K.E. was buckled into the car seat. The six individuals were driving to a grocery store when Tiffany, "show[ing] off her [new] car," began to speed. *Tr. Vol. 3* at 8. Reaching speeds of more than 100 miles per hour, Tiffany drove over a small hill, swerved to avoid an oncoming vehicle, swerved again to avoid a telephone pole, and lost control of the car. Tiffany's car began to skid, went off the road into a cornfield, and rolled over several times before landing on its roof.

[5] Christina testified that, as a result of the accident, she, B.E., K.E., and A.K. were ejected from the car. She said that she was thrown twenty feet from the car, and K.E., still in her car seat, landed seven feet from Christina. *Id.* at 11-12. Hearing K.E.'s cries, Christina rushed to her side and unbuckled K.E. from her car seat. From inside the car, Burden, asking about K.E., repeatedly yelled, "Where's the f***ing baby at." *Id. 3* at 14. Christina responded, "She's right f***ing here in my arms." *Id*. When Burden extricated himself from the car, he went up to Christina and, again, asked about K.E. *Id*. at 15. Christina told Burden that K.E. was in her arms. *Id*. It was at that time that Burden asked if everyone was okay, and Christina said, "Yeah, everybody's fine." *Id*. That was the last time Christina saw Burden at the scene of the accident.

[6] Dewain Davis ("Davis"), the driver of the car that Tiffany almost hit, testified that he saw the accident and called 911 to report it. *Tr. Vol. 2* at 183. After Davis got off the phone, he approached the crash site and saw six individuals outside the wrecked car—two adult females, three children, and a male, later

identified as Burden. Davis asked if everyone was okay, and he was assured that no one else was in the wreck. Davis saw Burden ask a passing driver if she would take him to get help. *Id*. at 188. When she refused, Burden asked whether Davis would give him a ride to get help. *Id.* at 186. Davis also refused, explaining that he had called 911 and "help was on the way." *Id*. Davis testified that Burden "asked another gentleman there if he would take him to the house down the way to get help and that gentleman[, Michael Hartle ("Hartle"),] did take [Burden]." *Id*. at 187.

[7] Hartle testified that he came upon the accident and saw a couple of farmers he knew at the scene. Hartle and the farmers tried to call 911, but were unsuccessful because they were in a cellular dead zone. *Id*. at 207. Burden, "cut up and injured," approached Hartle, who asked Burden if he or anyone else needed medical attention. *Id*. at 206. Burden explained that he had gone through the windshield of the car, was the only one injured, and no one else needed medical assistance, but continued that he had children in the car and needed to call his mother-in-law to come to the scene to pick them up. *Id*. at 206, 208. Burden said his phone did not work, explained that his house was down the road, and asked Hartle to take him there so he could call the police. Understanding that his own phone did not work, Hartle believed Burden and drove him home. Burden left the scene before the deputies arrived. Deputies later determined that Burden never called anyone for help after he left the scene. Pulaski County Sheriff's Deputy Aaron Himes, who was one of the first to

respond to the scene, testified that he believed Burden left the scene because there was "a warrant out for him." *Id.* at 165.

[8] Diana Lynn Farris ("Farris"), one of the paramedics who responded to the scene, testified about the heightened suspicion of injury for victims who have been ejected from a vehicle. *Id.* at 220. Farris was the paramedic overseeing K.E.'s care. She testified, "I listened to the baby's breath sounds, looked at the color, did like a quick assessment. . . . Her heart rate was good, her lung sounds were good. . . . [S]o she looked fine at that point without having x-ray vision." *Id.* at 221. Farris qualified her assessment, saying, "I suspect the worst in every kid . . . . They look fine one minute, and they're dead the next. That's how . . . we are taught to look for and treat trauma children because that's what they do. Adults tend to slowly decline and decline . . ., but kids are the total opposite. They look fine, they compensate, they compensate, they compensate, and then they drop off the cliff." *Id.* at 223. K.E. was taken by helicopter to a facility with a trauma center, as protocol directed. *Id.* at 225.

[9] On October 8, 2015, the State charged Burden with Level 6 felony neglect of a dependent. On February 21-22, 2017, a jury trial was held, at the conclusion of which, the jury found Burden guilty as charged. The trial court imposed a two-year sentence. Burden now appeals, arguing that there was insufficient evidence to support his conviction.

# Discussion and Decision

[10] Our standard of review upon a challenge to the sufficiency of the evidence is well established: we do not reweigh the evidence or judge the credibility of witnesses. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). We examine only the probative evidence and reasonable inferences therefrom that support the conviction. *Lock v. State*, 971 N.E.2d 71, 74 (Ind. 2012). "[W]e affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004).

[11] To obtain a conviction for Level 6 felony neglect of a dependent, pursuant to Indiana Code section 35-46-1-4(a)(1) ("the Neglect Statute"), the State had to prove beyond a reasonable doubt that Burden: (1) had the care of a dependent, K.E.; and (2) knowingly or intentionally placed K.E. in a situation that endangered her life or health. On appeal, both parties argue extensively about whether there was sufficient evidence to prove that K.E. was a dependent in Burden's care. However, we need not resolve that issue to decide the instant appeal, because there is a second element that must be proven. Assuming, without deciding, that there was sufficient evidence that K.E. was a dependent in Burden's care, the key evidentiary question under the Neglect Statute was whether Burden knowingly placed K.E. in a situation that endangered her life or health.

[12] "A person engages in conduct knowingly if, 'when he engages in the conduct, he is aware of a high probability that he is doing so.'" *Villagrana v. State*, 954 N.E.2d 466, 468 (Ind. Ct. App. 2011) (quoting Ind. Code § 35-41-2-2(b)). The mens rea under the Neglect Statute, requires the defendant to have a "'subjective [ ] aware[ness] of a high probability that he placed the dependent in a dangerous situation.'" *Perryman v. State*, 80 N.E.3d 234, 250 (Ind. Ct. App. 2017) (quoting *Gross v. State*, 817 N.E.2d 306, 308 (Ind. Ct. App. 2004)). Our court has repeatedly held that the Neglect Statute "must be read as applying only to situations that expose a dependent to an 'actual and appreciable' danger to life or health." *Scruggs v. State*, 883 N.E.2d 189, 191 (Ind. Ct. App. 2008) (citing *Gross*, 817 N.E.2d at 308 (citing *State v. Downey*, 476 N.E.2d 121, 123 (Ind. 1985))), *trans. denied*. In *Scruggs*, we reiterated:

> [T]hat to be an "actual and appreciable" danger for purposes of the neglect statute when children are concerned, the child must be exposed to some risk of physical or mental harm that goes *substantially beyond the normal risk* of bumps, bruises, or even worse that accompany the activities of the average child. This is consistent with a "knowing" mens rea, which requires subjective awareness of a "*high probability*" that a dependent has been placed in a dangerous situation, *not just any probability*.

*Scruggs*, 883 N.E.2d at 191 (quoting *Gross*, 817 N.E.2d at 308). The purpose of the Neglect Statute "is 'to authorize the intervention of the police power to prevent harmful consequences and injury to dependents' without having to wait for actual loss of life or limb." *Gross*, 817 N.E.2d at 309 (quoting *Downey*, 476 N.E.2d at 123). "'Because such a finding requires one to resort to inferential

reasoning to ascertain the defendant's mental state, the appellate courts must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper.'" *Id*. (quoting *McMichael v. State*, 471 N.E.2d 726, 731 (Ind. Ct. App. 1984), *trans. denied*).

[13] Here, the evidence adduced at trial demonstrated the following. On September 28, 2015, Tiffany was driving Christina, Burden, and the three children to the grocery store. Burden sat in the passenger seat, and Christina sat in the back seat. K.E. was buckled into a car seat, which Christina held on her lap. Tiffany wanted to "show off" her new car and began driving faster. *Tr. Vol. 3* at 8. Reaching a speed in excess of 100 miles per hour, Tiffany crested a small hill, swerved to avoid an oncoming car, and swerved again to avoid a telephone pole. Tiffany's car began to skid, went off the road into a cornfield, and rolled over several times landing on its roof. During the rollover, Christina, B.E., K.E., and A.K. were ejected from the car.

[14] The above circumstances did not factor into the State's decision to bring neglect of a dependent charges against Burden. Instead, it was Burden's act of leaving the scene of the accident that was the basis for the State's decision to bring charges against Burden. Specifically, the State contends that by leaving the scene of the car accident, Burden placed K.E. in a situation that endangered her life or health. *Appellee's Br*. at 32. The State argues that Burden should have known he was leaving K.E. in appreciable danger because she had been ejected from Tiffany's car during a high-speed crash, a situation compounded by the fact that K.E. had recently undergone surgery. *Id*. at 35. The State asserts that

Burden should not have left K.E. with Christina, who had shown her parenting deficiencies by failing to properly secure K.E. into the car. *Id*. at 36. The State also points to the fact that K.E. could have sustained internal injuries, which would have required immediate attention. *Id*. at 15.

[15] Burden responds that these facts and inferences do not support a finding that he had a subjective awareness of a "high probability" that K.E. was placed in a dangerous situation by his act of leaving the scene. *Appellant's Br*. at 35 (citing *Gross*, 817 N.E.2d at 308). We agree. The evidence before the trial court revealed that, after the accident, Burden repeatedly inquired as to the whereabouts of K.E. *Id*. at 14. Christina responded, at least twice, that K.E. was in her arms. *Id*. There was no evidence that Burden had ever received first aid training. Furthermore, Burden's ability to care for K.E. was limited because Christina, by her own admission, did not allow Burden to provide care for K.E., and when it came to medical care for K.E., Christina's decision was the "rule of the day." *Tr. Vol. 3* at 40. Before Burden left the scene, Christina told him that everyone was fine, and Davis informed Burden that 911 had been called and assistance was on the way. Moreover, K.E. and the other occupants of the car, with the exception of B.E.,[3] appeared uninjured[4] and, in fact, did "not have any serious injuries." *Id*. at 24. Finding no evidence to support the

---

[3] Here, the State had charged Burden with neglect of a dependent only as to K.E. B.E.'s condition at the scene was irrelevant to the evidence necessary to convict Burden of neglect of dependent.

[4] Davis testified that, while he had no way of examining the folks at the scene, it "looked like everybody was okay." *Tr. Vol. 2* at 197.

element that Burden had a subjective awareness of a high probability that, by leaving the scene, he had placed K.E. in a situation that endangered her life or health, we reverse Burden's conviction for Level 6 felony neglect of a dependent.[5]

[16]   Reversed.

Bailey, J., and Pyle, J., concur.

---

[5] Here, some of the evidence pertaining to Burden's role as a father could have been seen as unflattering, and the State contends that Burden fled the scene in order to avoid arrest on a pending warrant. Notwithstanding that evidence, we note that even a self-serving motive for leaving the scene is irrelevant where that evidence is insufficient for a jury to find beyond a reasonable doubt that Burden was subjectively aware of a high probability that by leaving the scene, he had placed his dependent, K.E., in a situation that created an actual and appreciable danger to her.