FILED

Feb 28 2018, 10:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jarod Thomas McMillan, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | February 28, 2018 <br><br> Court of Appeals Case No. <br> 45A04-1708-CR-1819 <br><br> Appeal from the Lake County <br> Superior Court <br><br> The Honorable Samuel L. Cappas, <br> Judge <br><br> Trial Court Cause No. <br> 45G04-1607-F1-007 |

**Vaidik, Chief Judge.**

## Case Summary

[1] Jarod McMillan and the State entered into a plea agreement that called for McMillan to plead guilty as charged to eight counts of neglect of a dependent, including one count of Level 1 felony neglect of a dependent for knowingly or

intentionally depriving his three-month-old son of necessary support (food and/or medical care), which resulted in his son's death. According to the plea agreement, sentencing was left to the discretion of the trial court, except that the sentences would run concurrently. The trial court accepted the plea agreement and entered judgments of conviction. Before sentencing, however, the court revoked its acceptance of the plea agreement and set the case for trial because it found that McMillan asserted his innocence to the Level 1 felony. A jury found McMillan guilty as charged, and the trial court sentenced him to eight-and-a-half years more than the plea agreement would have allowed.

[2] McMillan now appeals, arguing that the trial court erred in revoking its acceptance of the plea agreement and forcing him to go to trial. Because the record reflects that the trial court believed that McMillan did not admit that he was subjectively aware of a high probability that his conduct would result in his son's health or life being at risk or in danger, we conclude that the trial court did not abuse its discretion when it revoked its acceptance of McMillan's plea agreement. We therefore affirm the trial court.

# Facts and Procedural History

[3] In 2016, McMillan and Katherine Holmes lived together in a one-bedroom apartment in Gary with Holmes's six children; McMillan was the father of Holmes's three youngest children. On March 31, 2016, Kannon McMillan, the youngest of the six children, was born. He weighed five pounds, five ounces at birth.

[4] Kannon passed away on July 5. The cause of Kannon's death was complications of severe malnutrition; Kannon had gained just four ounces since birth,[1] was "skin and bones," and had "severe sucking blisters" on his fingers from trying to get food. Trial Tr. Vol. IV pp. 40-41. Kannon showed other signs of neglect, too. Kannon was dirty, his penis was "red and raw," and he had third-degree or full thickness burns to his perineum, as if he was sitting in his own urine. Trial Tr. Vol. II p. 134. Due to the condition of McMillan and Holmes's home, the other children were removed.

[5] The State charged McMillan with one count (Count I) of Level 1 felony neglect of a dependent (Kannon) based on knowingly or intentionally depriving Kannon of necessary support (food and/or medical care), which resulted in his death, and seven counts (Counts II–VIII) of Level 6 felony neglect of a dependent (two counts for Kannon and one count for each of the other five children). Appellant's App. Vol. II pp. 12-15. In February 2017, McMillan and the State entered into a plea agreement. *Id.* at 53. According to the plea agreement, McMillan would plead guilty to all of the charges, the parties were "free to fully argue their respective positions as to the sentence to be imposed by the Court," and the sentences would be served concurrently. *Id.* at 54. Thus,

---

[1] According to a pediatrician who testified at trial, "A baby when they are born loses weight initially. Because they are losing . . . water. And then, by a week to ten days, they get back to birth weight. And then after that, they should gain an ounce a day for their first month of life." Trial Tr. Vol. IV p. 37.

McMillan faced a sentencing range of twenty to forty years.[2] The parties also stipulated to a factual basis. *Id.* at 55, 57-58.

[6]     At the guilty-plea hearing, McMillan informed the trial court that he had made changes, which were initialed by him, his attorney, and the prosecutor, to the stipulated factual basis:

4. That Kannon McMillan was born on March 31, 2016 at Methodist North Lake Hospital with a birth weight of 5 lbs, 5 oz at a gestational age of 36 weeks.

5. That Kannon McMillan and mother Katherine Holmes were discharged from the hospital on April 2, 2016.

6. That Kannon McMillan was transported by ambulance to Methodist North Lake Hospital where he was pronounced dead at 5:37 pm and at that time weighed 5.9lbs *on July 5, 2016* JM LS RDM

7. That the medical records state "clinically the patient appears neglected, is thin for his age, has no body fat, groin and perineum appear like burns possibly from urine, patient is covered in dirt".

8. That at no time during the life of Kannon McMillan did Jarod McMillan seek require medical intervention for his infant son ~~who clearly showed~~ signs ~~slowly wasting away~~ (LS) JM RDM

9. That Jarod McMillan was not employed and stayed at home with the children while the mother worked.

10. That the home in which the victims lived was roach flea and bedbug infested, there was garbage strewn through out the apartment, there were no beds in the apartment and three adults and five children lived in the apartment, *but there were air mattresses.* (LS) JM RDM

11. That Jarod McMillan failed to clean and insure that the apartment was in a livable condition.

12. ~~That when the remaining children were removed from the apartment they all reeked of a foul odor and were all in need of baths~~ (LS) JM RDM

13. That all of these events occurred in Lake County, Indiana.

---

[2] The State charged Holmes with the same offenses, and she and the State entered into a similar plea agreement. The trial court sentenced her to forty years, the maximum under her plea agreement. She appealed her sentence, arguing that the trial court erred by not recognizing three mitigators and that her sentence is inappropriate. We affirmed. *See Holmes v. State*, 86 N.E.3d 394 (Ind. Ct. App. 2017), *trans. denied*.

*Id.* at 57-58; Appellant's App. Vol. III pp. 43, 45, 46. The trial court "expressed concern with the edits to the stipulated factual basis and the hesitant manner in which [McMillan] responded when questioned by the court" about them. Appellant's App. Vol. III pp. 43, 45, 46. Although McMillan was "resistant and hesitant to admit any personal responsibility for his part in the[] crimes," "he ultimately did admit his part." *Id.* The trial court accepted the plea agreement, entered judgments of conviction, and scheduled a sentencing hearing. *Id.*; Appellant's App. Vol. II pp. 6-7 (CCS entry).

[7] Before sentencing, McMillan sent the trial court two letters. The first letter, referencing paragraph 8 of the factual basis, states:

> As for 8 stating that Kannon was clearly slipping away, your honor as i've told my attorney, every child that Ms. Holmes has birthed was small and this time was no different sir. My first two sons were both born early as well as her other kid's, and she's what is called a High Risk Pregnancy every time she carries. I just say these things to say to you Mr. Cappas sir that I did'nt think he was in danger of dying and that i've brought my other children along just fine (stature/physically wise). Your honor I had no intention of this happening, and this is the honest to God truth.

Appellant's App. Vol. II p. 60. In the second letter, McMillan wrote:

> In the case of my son Kannon sir, he sometimes fed more or less than other times and i thought it was just his appetite being up and down sir, my son Keelan fed the <u>same way</u> as <u>a infant</u>, and as he came along so did his appetite as well as his weight sir. Kannon showed no signs of being ill your honor, he smiled and craved the attention of being held just the same as other babies

often do sir . . . . Having done it with my two other sons your honor, i felt like i'd bring his weight alon[g] fine sir. . . . Your honor i plead out because i know had Kannon not missed doctors appointments, that whatever problems he had would have been addressed. . . . I'm so sorry that this occurred Mr. Cappas. It was not intentional sir. I beg of your mercy sir, please?

*Id.* at 64-65.

[8] In response to these letters, the trial court, on its own motion, set a hearing to determine whether it should set aside the plea agreement and set the case for trial. The court believed that the letters indicated that McMillan "didn't have any idea what was going on [with Kannon], which [was] contradictory to what he pled to." Mar. 21, 2017 Tr. p. 5. As support, the court cited *Beech v. State*, which holds that "a trial court may, on its own motion, set aside a guilty plea if the defendant asserts his innocence after the plea has been accepted but prior to sentencing" and that "any defendant who openly straddles the fence by declaring both his guilt and innocence . . . at any point before sentencing . . . runs the risk that the trial court will . . . set aside the plea." 702 N.E.2d 1132, 1136 (Ind. Ct. App. 1998).

[9] At the hearing, McMillan was placed under oath, and the trial court, defense counsel, and prosecutor took turns questioning him regarding Count I. Specifically, defense counsel asked McMillan if he thought Kannon needed medical help in light of the autopsy photographs showing Kannon's ribs, and McMillan responded:

Like I said, I am used to my kids being small. It's more, like, I was -- I didn't think that it was anything that I would do, like, you know, different from my first two sons as far as eating and gaining weight.

Mar. 21, 2017 Tr. p. 15. The court interrupted:

THE COURT: So you thought it was okay? He was okay? He was going to be okay?

[MCMILLAN]: I knew he needed to pick up weight like I did with my first two sons. And I thought that I could do that, because I have done it just, you know, feeding them regularly. And when they get of a certain age, you can add things to the formula. That helps.

*Id.* Defense counsel then asked McMillan if he knew that there was a problem with Kannon's weight, and McMillan said, "We knew he was small" and that he "had not picked up a lot of weight." *Id.* at 16. The prosecutor then took over questioning:

Q. You knew your child was underweight; didn't you?

A. Yes.

Q. And you also knew -- you saw the pictures from the autopsy; did you not?

A. Yes.

Q. And those pictures reflected the way your child presented and the way your child looked on the day that your child died; correct?

A. Yes.

Q. Given what you saw there and what you saw during the life of Kannon, you knew that Kannon was in need of medical intervention; didn't you?

A. I guess.

* * * * *

Q. And you failed to insist or to seek that medical intervention; did you not? Is that correct or not?

A. Yes. Yes.

THE COURT: Okay. Well, he's got his head down and he's, like, shaking his head and admitting this --

* * * * *

Q. You weren't working; were you?

A. No.

Q. Katherine was working; correct?

A. Yes.

Q. And it was your responsibility to look after and see for the child when she was at work; correct?

A. Yes.

Q. And during that period of time, you were aware that this child was experiencing a physical difficulty that needed to be addressed by a physician; weren't you?

A. I mean, like I said –

Q. Yes or no? I mean, either you were or you weren't.

A. Sometimes he ate and took more in a feeding than he did in others.

Q. The child died of malnutrition and dehydration. Sometime during his three-month lifetime, his 97 days on earth, you were aware that he needed to go to the hospital to the emergency room; weren't you?

A. Yes.

[PROSECUTOR]: I think that establishes – he said, yes. And I think that establishes a factual basis.

[MCMILLAN]: I mean, the doctor's appointments were made and switched ---

[PROSECUTOR]: There's no question before you, sir.

THE COURT: Okay. Well, I want to hear it, because he's going to write me another letter, and then I am going to have a problem. He needs to get it all out now.

[MCMILLAN]: Your Honor, when I wrote you the letters, I was trying to just, kind of, inform you of, you know, the way things were going in my life and, you know, like, exactly what was happening. And, like, I think I said in one of the letters, I pled guilty, your Honor, because I know that had Kannon . . . made it to the doctor appointment that this most likely would have been prevented. And regardless of -- you know, I know that regardless of reasoning and excuse, you know, that we didn't take him. . . . That's what the writing was about. I was just trying to tell you that I pled guilty. I pled guilty, because I knew if I would have—if we would have gotten him to the doctor's appointments that probably it would have prevented him -- we didn't do that. But I was trying to get you to see that, you know, it wasn't a thing like I just -- I just decided that I didn't want him or didn't want to take care of him properly or anything like that. Like, he was not gaining weight. I know that I fed him. And like I said, sometimes he fed more than other times. And, obviously, it was a bad choice to make, or however I am supposed to articulate it. But I was—I just figured that I could, you know, continue to feed my child and, you know, like I said, in due time he would gain weight. . . . That's why I wrote you for just trying to -- just trying to clear up some of -- you know, like, it being said that, you know, like -- I guess the main thing that he was starved. I did not -- I did not starve him. I fed him. Why the weight was not coming could have been determined had we made those doctor's appointments, and I did not.

*Id.* at 17-21. The court then confirmed with McMillan that he thought he was feeding Kannon "in such a way where he was going to be just like Keelan and make it out of his small weight," and McMillan said yes. *Id.* at 21. At this

point, the court explained to McMillan "the problem." *Id.* at 21-22. That is, the court said Count I required him to admit that he "knowingly or intentionally deprived Kannon of the necessary support, which resulted in his death." *Id.* at 22. "You have to know that this kid was not eating right, not gaining weight, basically, starving to death. So if you knew that's what was happening, okay. If you didn't know that, then there's a problem. It needs to go to a trial." *Id.* at 22-23. Defense counsel then pointed out to the court that McMillan nevertheless admitted that he failed to ensure that Kannon was taken to the doctor. But the court was not persuaded: if McMillan "wasn't aware that the kid needed to be [taken to the doctor], then he can't be faulted for not taking the kid to the doctor. He has to be aware that the kid needed to be taken." *Id.* at 24. The court identified this as "the essence of the case." *Id.* at 24-25. And because McMillan had scratched out "who clearly showed signs [of] slowly wasting away" from the stipulated factual basis, the court had serious concerns. *Id.* at 25.

[10] The court took the matter under advisement and later issued an order setting aside the plea agreement and setting the case for trial. Appellant's App. Vol. II p. 79. A jury then found McMillan guilty as charged, and the trial court sentenced him to forty-eight-and-a-half years, eight-and-a-half years more than the plea agreement would have allowed.

[11] McMillan now appeals.

# Discussion and Decision

[12] McMillan argues that the trial court erred in setting aside the plea agreement after accepting it and entering judgments of conviction.[3] Whether to accept or reject a proffered plea agreement is within the discretion of the trial court. *Campbell v. State*, 17 N.E.3d 1021, 1023 (Ind. Ct. App. 2014). But once the court accepts a plea agreement, "it shall be bound by its terms." Ind. Code § 35-35-3-3(e); *Reffett v. State*, 571 N.E.2d 1227 (Ind. 1991), *overruled on other grounds by Robinson v. State*, 805 N.E.2d 783 (Ind. 2004).[4] Accordingly, the general rule is that trial courts lack the authority to set aside plea agreements once they have been accepted and judgments of conviction have been entered— even if the defendants have not been sentenced. *Stone v. State*, 27 N.E.3d 341, 343 (Ind. Ct. App. 2015); *Campbell*, 17 N.E.3d at 1023.

[13] But there are exceptions to this rule. That is, trial courts have limited discretion to revoke their acceptance of plea agreements in the following circumstances:

---

[3] The State argues on appeal that the trial court properly set aside the plea agreement. McMillan then argues in his reply brief that the State has "waived" this argument because the prosecutor argued in favor of the plea agreement below. Appellant's Reply Br. p. 7. Although the State argued in favor of the plea agreement below, this does not relieve the trial court of its obligation to ensure that McMillan's guilty plea was an unqualified admission of his guilt. This protects the defendant's right to require proof of his guilt before a jury and obviates a collateral attack on a judgment by a later claim that the plea was too equivocal to bind the pleader and permit the entry of judgment. *Patton v. State*, 517 N.E.2d 374, 376 (Ind. 1987), *reh'g denied*. Accordingly, the trial court was not bound to the State's opinion below that McMillan had properly admitted his guilt.

[4] As the Indiana Supreme Court advised in *Reffett*, the best course of action is for a trial court, following a guilty-plea hearing, to take the guilty plea under advisement until sentencing. 571 N.E.2d at 1229 n.3. This way, the trial court does not become bound by the terms of the plea agreement until a later date. If the trial court had followed that course of action here, it could have simply rejected the plea agreement upon receiving the letters. In fact, McMillan's plea agreement provided: "The Parties agree that the plea agreement will be taken under advisement until the sentencing date at which time the Court will either accept or reject the plea agreement." Appellant's App. Vol. II p. 55.

(1) when a defendant asserts his innocence (because inconsistent assertions raise questions about the voluntariness of the plea) and (2) when a defendant breaches the terms of the plea agreement (because principles of fairness do not demand the State's adherence to a plea agreement that the defendant himself has breached). *Messersmith v. State*, 70 N.E.3d 861, 864-65 (Ind. Ct. App. 2017) (citing *Beech*, 702 N.E.2d at 1136; *Campbell*, 17 N.E.3d at 1025); *Stone*, 27 N.E.3d at 343.

[14]   Here, the trial court revoked its acceptance of McMillan's plea agreement because it found that McMillan asserted his innocence to Count I, which alleges that McMillan knowingly or intentionally deprived Kannon of necessary support (food and/or medical care), which resulted in Kannon's death. *See* Ind. Code § 35-46-1-4(a)(3), (b)(3); Ind. Code § 35-46-1-1 (defining "support" as "food, clothing, shelter, or medical care"); *see also* Appellant's App. Vol. II p. 12 (charging information). As this Court explained in *Ricketts v. State*, neglect of a dependent under subsection (a)(3)—not including the resulting-in-death enhancement that was charged here—is defined as the defendant's "knowing or intentional deprivational conduct regarding food, clothing, shelter, or medical care, that results in the dependent's health or life being at risk or in danger." 598 N.E.2d 597, 601 (Ind. Ct. App. 1992), *trans. denied*. A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. Ind. Code § 35-41-2-2(b). "Proper analysis of the child neglect statute requires this court to apply a subjective standard to the term 'knowingly.'" *Ricketts*, 598 N.E.2d at 601; *see also Burden v. State*, No.

66A03-1706-CR-1298, 2018 WL 542983, at *3 (Ind. Ct. App. Jan. 25, 2018).
Therefore, for purposes of subsection (a)(3), the defendant must have been
subjectively aware of a high probability that his conduct would result in the
dependent's health or life being at risk or in danger.

[15] We find that the trial court acted within its discretion when it revoked its
acceptance of McMillan's plea agreement. When McMillan was asked at the
hearing if he thought Kannon needed medical help, McMillan answered that he
was "used to [his] kids being small" and that he "didn't think that it was
anything . . . different from [his] first two sons as far as eating and gaining
weight." Mar. 21, 2017 Tr. p. 15. And when asked if he thought Kannon was
going to be "okay," McMillan answered: "I knew he needed to pick up weight
like . . . my first two sons. And I thought that I could do that, because I have
done it just, you know, feeding them regularly." *Id.* McMillan said that his
first two sons are "both healthy." *Id.* at 21. In short, McMillan, on several
occasions, expressed that he thought Kannon was "going to come along" and
that he "would bring [Kannon's] weight up." *Id.* at 16. In other words,
McMillan did not think that there was anything wrong with Kannon. In fact,
McMillan was adamant that he fed Kannon and declared to the court: "I did
not starve [Kannon]. I fed him." *Id.* at 21. The trial court found that "the
essence of the case" was whether McMillan subjectively knew that Kannon was
at risk or in danger, and the court said that was the evidence it was looking for
but had not heard. *Id.* at 24-25.

[16] Although it is true that McMillan also testified that he "didn't get [Kannon] to the doctor when he needed to be there," *id.* at 33, which suggests that McMillan knew that something was wrong with Kannon, the court was free to discredit this statement in light of McMillan's other testimony and actions, including the changes he made to the stipulated factual basis, that he was "resistant and hesitant to admit any personal responsibility" at the guilty-plea hearing, and the letters he wrote to the court. Moreover, as the court explained at the hearing, the relevant time period was what McMillan "thought when it was going on," not what he thought in hindsight as an "armchair quarterback." *Id.* at 23. And as the court expressed to McMillan at the hearing, it did not want to risk McMillan later changing his mind about pleading guilty. *Id.* at 22. Because the record reflects that the trial court, after hearing testimony from McMillan, believed that McMillan did not admit that he was subjectively aware of a high probability that his conduct would result in Kannon's health or life being at risk or in danger, we conclude that the court did not abuse its discretion when it revoked its acceptance of McMillan's plea agreement.[5] We therefore affirm the trial court.

[17] Affirmed.

---

[5] McMillan argues that there is no mens rea requirement for the resulting-in-death enhancement and therefore the trial court "incorrectly required proof that [he] knew with a high probability that his actions would cause Kannon's death." Appellant's Reply Br. p. 5. We do not reach this argument. Because the trial court found that McMillan failed to adequately plead guilty on the underlying neglect charge, it is irrelevant whether the trial court demanded too much regarding the resulting-in-death enhancement.

May, J., and Altice, J., concur.