


FILED

Sep 17 2025, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Matthew Joseph Dirig,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

September 17, 2025

Court of Appeals Case No.
25A-CR-119

Appeal from the Huntington Circuit Court

The Honorable Davin G. Smith, Judge

Trial Court Cause No.
35C01-2212-F1-398

---

**Opinion by Judge Mathias**
Chief Judge Altice and Judge DeBoer concur.

**Mathias, Judge.**

[1] Matthew Joseph Dirig appeals his conviction for Level 1 felony neglect of a dependent resulting in death. Dirig raises three issues for our review, which we restate as follows:

> 1. Whether reversible error occurred in the admission of certain evidence.
>
> 2. Whether the State presented sufficient evidence to support Dirig's conviction.
>
> 3. Whether errors in the jury instructions rise to the level of reversible error under the fundamental error doctrine.

[2] We affirm.

## Facts and Procedural History

[3] In 2014, A.C. gave birth to her son, T.C. T.C.'s father was not present in T.C.'s life at any point. When T.C. was six years old, he was diagnosed with attention-deficit/hyperactivity disorder and oppositional defiant disorder. T.C.'s diagnoses meant that he often presented with hyperactivity, impulsiveness, anger, irritability, and "sometimes vindictiveness." Tr. Vol. 4, p. 123. During emotionally reactive episodes, T.C. could be violent to himself or others, and he could "make comments about wanting to die or wanting to kill himself[.]" Tr. Vol. 3, p. 175. At one point in second grade, which was the 2021-22 academic year, T.C. attempted to strangle himself at school with a

phone cord. T.C. participated in individual therapy, had prescription medication, and had an IEP at his school.

[4] In May 2022, A.C. started dating Dirig. A.C. told Dirig about T.C.'s mental-health and behavioral issues shortly after they had started talking, including T.C. having wrapped a cord around his neck during second grade. Dirig moved into A.C.'s home in Huntington with T.C. in June. Shortly after moving in, Dirig, who had been sober, "started drinking again" and "it got out of control really fast." *Id.* at 165. When drinking, Dirig "would sometimes get . . . belligerent" with A.C. *Id.* Dirig also set up a personal "gaming area" in one of the bedrooms where he would isolate himself for extended periods of time. *Id.* at 163.

[5] Prior to Dirig moving in with them, T.C. had been "making a lot of progress" with his behaviors and "was starting to do really, really good in school again." *Id.* at 166. But, after Dirig moved in and as the summer progressed, T.C. started having setbacks. Dirig and A.C. discussed how to discipline T.C. at home, and Dirig changed out the lock on the door to T.C.'s bedroom to be able to lock the door from outside the room. When T.C. had emotionally reactive moments, Dirig and A.C. would have T.C. "sit in his room for a few minutes" and would occasionally lock T.C. in his bedroom. *Id.* at 175. A.C. and Dirig agreed that, when they locked T.C. in his room, it would only be for five or ten minutes, and one of them would stay outside the door to monitor T.C. *See id.* at 212.

[6] By the beginning of the school year, T.C. had significantly regressed, including "getting really angry" more frequently and more often making comments "about . . . wanting to harm himself or . . . wanting to die . . . ." *Id.* at 171, 176. T.C. made those comments in the presence of both A.C. and Dirig. Around that same time and while in the care of a babysitter, T.C. wrapped a towel around his own neck, but T.C. was ultimately unharmed. Dirig was aware of that incident.

[7] Sometime after that incident, T.C. had an emotionally reactive episode at his school. A.C. and Dirig took T.C. to a nearby emergency room, and T.C. was admitted for in-patient treatment at Parkview Behavioral Health Hospital. T.C. stayed at Parkview for one week; A.C. visited him every day, but Dirig treated the time as a "vacation." *Id.* at 219. However, Dirig did attend a "family session" with A.C. and T.C. at Parkview to come up with a "safety plan" to ensure that T.C. "remained safe" at home during a "crisis." *Id.* at 221. That safety plan was written down and signed by both A.C. and Dirig and specifically included making the home safe for T.C. by removing items with which T.C. could strangle himself.

[8] Following his release from Parkview, T.C. had good days and bad days. In late September, he threatened to strangle himself to death at school. Dirig gave A.C. an "ultimatum" to either "get [T.C.] under control or he was going to leave . . . ." *Id.* at 232. Around mid-October, Dirig consumed some of T.C.'s prescription medicine, and A.C. confronted Dirig about it. Thereafter, A.C. began locking up T.C.'s medications.

[9] At his after-school care program on Tuesday, November 22, T.C. had an emotionally reactive episode. Program officials asked A.C. to pick T.C. up early, but A.C. was unavailable, and so she asked Dirig to pick him up. When Dirig arrived, T.C. "became aggressive and hysterical . . . ." Tr. Vol. 5, p. 67. Dirig carried T.C. to his car and took him home. At home, T.C. remained "very aggressive," and Dirig picked T.C. up from "under the arms and dragg[ed] him to his room, . . . locked the door, and then went into" the gaming room and "played video games" for the next hour without checking on or monitoring T.C. *Id.* at 67-68.

[10] Dirig and A.C. had not made T.C.'s bedroom safe from strangulation hazards, including leaving industrial zip ties from Dirig's work and various cords in T.C.'s bedroom. While Dirig played video games, T.C. pulled a zip tie around his neck, causing his own death.

[11] A.C. arrived home about two hours after Dirig had picked T.C. up from the after-school program. She discovered T.C. dead in his room. Officers who responded to the scene noticed that Dirig appeared "[n]on-remorseful" over T.C.'s death. *Id.* at 3. And Dirig later admitted to knowing that there were items in T.C.'s room with which T.C. could strangle himself. *See id.* at 66.

[12] The State charged Dirig with Level 1 felony neglect of a dependent and charged A.C. with Level 6 felony neglect of a dependent. A.C. pleaded guilty and was sentenced accordingly. Dirig proceeded to a jury trial, at which A.C. provided extensive testimony. Part of her testimony included Dirig's mid-October 2022

consumption of T.C.'s prescription medications; Dirig objected to that testimony on relevance grounds, which the trial court overruled. *See* Tr. Vol. 3, pp. 233-34.

[13] Thereafter, the trial court instructed the jury in relevant part and without objection as follows:

> Final Instruction 5, Culpability: The culpability required for the offense charged is knowingly. A person engages in conduct knowingly if, when he engages in the conduct, he's aware of a high probability that he's doing so. *The culpability requirement for this offense is required with respect to every material element of the prohibited conduct*.

> Final Instruction 6, Neglect: *Neglect is defined as the want of reasonable care that is the omission of such steps as a reasonable caregiver will take* such as are usually taken in the course of ordinary experience.

> \* \* \*

> Final Instruction 9[,] Placing a dependent in a situation that endangers the dependent's life or health for the purposes of the neglect of a dependent statute[:] a dangerous situation is one that exposes a dependent to an actual and appreciable danger to life or health. The risk of physical or mental harm must go substantially beyond the normal risks that accompany the activities of the average child. To prove that the Defendant placed the dependent in a situation that endangered the dependent's life or health, *the State must have proved beyond a reasonable doubt that the Defendant was aware of facts that would alert a reasonable caregiver under the circumstances to take* affirmative action to protect the child.

Tr. Vol. 6, pp. 10-11 (emphases added).

The jury found Dirig guilty as charged. After a sentencing hearing, the trial court entered its judgment of conviction accordingly and sentenced Dirig to forty years in the Department of Correction, with thirty-eight of those years executed and two years suspended to probation.

This appeal ensued.

## 1. No reversible error occurred in the admission of the evidence.

On appeal, we first address Dirig's challenge to the trial court's admission of A.C.'s testimony that he had consumed T.C.'s prescription medications about one month prior to T.C.'s death. A trial court has broad discretion regarding the admission of evidence, and its decisions are reviewed only for abuse of that discretion. *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021).

Dirig objected to the admission of the evidence in the trial court as irrelevant under Indiana Evidence Rules 401 and 402. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Ind. Evidence Rule 401. Irrelevant evidence is not admissible. Evid. R. 402. We agree with Dirig that his mid-October consumption of T.C.'s prescription medications had no tendency to make any

fact of consequence regarding the alleged neglect on November 22 more or less probable, and, thus, the trial court erred when it admitted that evidence.[1]

[18] However, it is well settled that the erroneous admission of evidence may be harmless error. As our Supreme Court has made clear:

> When an appellate court must determine whether a non-constitutional error is harmless, [Indiana Appellate] Rule 66(A)'s "probable impact test" controls. Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below. Importantly, this is not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented. And when conducting that review, we consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case. Ultimately, the error's probable impact is sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined.

*Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023) (citations omitted). Applying that test here, we are confident that the evidence regarding Dirig's consumption of T.C.'s prescription medication had no impact on the jury's verdict against him on the neglect allegation. Accordingly, the trial court's erroneous admission of that evidence is not reversible error.

---

[1] Given our conclusion under Evidence Rule 401, we need not consider Dirig's separate argument under Evidence Rule 403.

## 2. The State presented sufficient evidence to support Dirig's conviction.

[19] We next consider Dirig's argument that the State failed to present sufficient evidence to support his conviction for Level 1 felony neglect of a dependent. For challenges to the sufficiency of the evidence, we consider only the probative evidence and the reasonable inferences therefrom that support the judgment of the trier of fact. *Hall*, 177 N.E.3d at 1191. We will neither reweigh the evidence nor judge witness credibility. *Id.* We will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[20] To prove Level 1 felony neglect of a dependent, the State was required to show, in relevant part, that Dirig, having care over T.C., "knowingly or intentionally" placed T.C. "in a situation that endanger[ed] [T.C.'s] life or health," which conduct resulted in T.C.'s death. Ind. Code § 35-46-1-4(a)(1), (b)(3) (2022). Dirig challenges only whether the State's evidence was sufficient to show that he acted knowingly and that his actions and inactions caused T.C.'s death.

[21] The State presented sufficient evidence to show that Dirig acted knowingly. A person engages in conduct "knowingly" if, when he engages in the conduct, "he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b). As we have summarized:

> The mens rea under the Neglect Statute[] requires the defendant to have a subjective awareness of a high probability that he placed the dependent in a dangerous situation. Our court has

repeatedly held that the Neglect Statute "must be read as applying only to situations that expose a dependent to an 'actual and appreciable' danger to life or health." *Scruggs v. State*, 883 N.E.2d 189, 191 (Ind. Ct. App. 2008) [(parenthetical omitted)], *trans. denied*. In *Scruggs*, we reiterated:

> . . . to be an "actual and appreciable" danger for purposes of the neglect statute when children are concerned, the child must be exposed to some risk of physical or mental harm that goes *substantially beyond the normal risk* of bumps, bruises, or even worse that accompany the activities of the average child. This is consistent with a "knowing" mens rea, which requires subjective awareness of a "*high probability*" that a dependent has been placed in a dangerous situation, *not just any probability*.

[883 N.E.2d at 191]. The purpose of the Neglect Statute is to authorize the intervention of the police power to prevent harmful consequences and injury to dependents without having to wait for actual loss of life or limb. Because such a finding requires one to resort to inferential reasoning to ascertain the defendant's mental state, the appellate courts must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper.

*Burden v. State*, 92 N.E.3d 671, 675 (Ind. Ct. App. 2018) (citation modified).

[22]     The State readily demonstrated that Dirig had a subjective awareness of a high probability that he had placed T.C. in a dangerous situation when Dirig locked T.C. in T.C.'s room for more than an hour without supervision. Dirig knew that T.C.'s emotionally reactive episodes presented suicide risks. Dirig specifically knew that T.C. had made repeated references to and had engaged in repeated behaviors relating to suicide-by-strangulation. Dirig knew that he and

A.C. needed to make the house safe for T.C., and he knew that included making the house safe from strangulation risks in particular. Dirig knew that T.C. was not to be left alone in his room for more than a few minutes and was to be monitored during that time. And Dirig knew that there were implements in T.C.'s room with which T.C. could strangle himself.

[23] Dirig argues that the State's evidence is insufficient because suicide is "unpredictable." Appellant's Br. at 23. Suicide may be unpredictable in some instances, but this was not one of them. Dirig also argues that suicide by children under ten is statistically rare in the United States. Be that as it may, the risk here was evident, and Dirig knowingly disregarded it. Dirig's other arguments on this issue simply seek to have our Court reweigh the evidence, which we will not do.

[24] Dirig also contends that the State failed to prove that his actions and inactions caused T.C.'s death. As we have explained:

> The concept of causation in criminal law is similar to that found in tort law. Like in tort law, the criminal act must be both 1) the actual cause (sometimes called the "cause-in-fact"); and 2) the legal cause (sometimes called the "proximate cause") of the result. Cause-in-fact requires that "but for" the antecedent conduct, the result would not have occurred. If there is more than one cause which precipitates the result, the defendant's action is the cause-in-fact if it is a "substantial factor" in bringing about that result.
>
> Legal or proximate cause is a distinct concept, speaking not to the physical relationship between the actor's conduct and the

> result[] but instead embodying a value judgment as to the extent of the physical consequences of an action for which the actor should be held responsible. Thus, proximate cause questions are often couched in terms of "foreseeability"; an actor is not held responsible for consequences which are unforeseeable. In Indiana, a result is deemed foreseeable if it is a "natural and probable consequence" of the act of the defendant.

*Bowman v. State*, 564 N.E.2d 309, 313 (Ind. Ct. App. 1990) (citation modified), *summarily aff'd in relevant part*, 577 N.E.2d 569, 571 (Ind. 1991).

[25] Dirig asserts that his actions and inactions vis-à-vis T.C. on November 22 were neither the cause-in-fact of T.C.'s death nor the proximate cause of T.C.'s death. We do not agree with either of Dirig's positions. But for Dirig locking an emotionally reactive T.C. in a room by himself with strangulation implements and without any supervision, T.C. would not have died. And, given T.C.'s medical and behavioral histories and Dirig's awareness of those histories, T.C.'s death was imminently foreseeable.

[26] Dirig's causation arguments simply seek to have our Court reweigh the evidence, which, again, we will not do. The State presented sufficient evidence to support Dirig's conviction for Level 1 felony neglect of a dependent.

## 3. The erroneous jury instructions are not reversible error under the fundamental error doctrine.

[27] Last, we turn to Dirig's argument that the manner in which the trial court instructed the jury requires reversal under the fundamental error doctrine. Dirig concedes that he did not object to the court's instructions to the jury at trial.

Thus, to demonstrate error on appeal, he must argue fundamental error, which requires him to show that the jury instructions were a blatant violation of his basic due process rights or that they denied him a fundamentally fair trial. *See, e.g.*, *Dunn v. State*, 230 N.E.3d 910, 914 (Ind. 2024).

[28] We initially acknowledge and agree with Dirig's position on appeal that Final Instructions 6 and 9 were legally erroneous. Again, those two instructions stated as follows:

> Final Instruction 6, Neglect: *Neglect is defined as the want of reasonable care that is the omission of such steps as a reasonable caregiver will take* such as are usually taken in the course of ordinary experience.
>
> * * *
>
> Final Instruction 9[,] Placing a dependent in a situation that endangers the dependent's life or health for the purposes of the neglect of a dependent statute[:] a dangerous situation is one that exposes a dependent to an actual and appreciable danger to life or health. The risk of physical or mental harm must go substantially beyond the normal risks that accompany the activities of the average child. To prove that the Defendant placed the dependent in a situation that endangered the dependent's life or health, *the State must have proved beyond a reasonable doubt that the Defendant was aware of facts that would alert a reasonable caregiver under the circumstances to take* affirmative action to protect the child.

Tr. Vol. 6, pp. 10-11 (emphases added).

Dirig's argument on appeal focuses on Final Instruction 6's definition of neglect as the want of "reasonable care" and such steps as a "reasonable caregiver" would take. Appellant's Br. at 30-31. He also disputes the correctness of Final Instruction 9's statement that he needed to be aware of facts that would alert a "reasonable caregiver" under the circumstances to protect the child.[2] *Id.* And, relatedly, Dirig notes that Final Instruction 6's definition of neglect is a civil definition, not a criminal one. According to Dirig, the use of a reasonable-person standard and the civil definition of neglect in those instructions diminished the State's burden to prove that Dirig had acted with the requisite subjective awareness of a "high probability" that he had placed T.C. in a dangerous situation. *See Burden*, 92 N.E.3d at 675.

To Dirig's point, the reasonable-person standard and the civil definition of neglect have occasionally made appearances in our Court's precedents discussing criminal neglect of a dependent. *See, e.g.*, *Dexter v. State*, 945 N.E.2d 220, 224 (Ind. Ct. App. 2011), *summarily aff'd in relevant part*, 959 N.E.2d 235, 237 (Ind. 2012). In *Dexter*, a panel of our Court cited a 1990 panel's opinion for the proposition that "the State need only prove that the accused was aware of facts which would alert a reasonable parent under the circumstances to take affirmative action to protect the child." *Id.* (citing *Hastings v. State*, 560 N.E.2d 664, 667 (Ind. Ct. App. 1990), *trans. denied*). The 1990 opinion, in turn, cited a

---

[2] We reject the State's argument that Final Instructions 6 and 9 do not speak to a defendant's mens rea.

1980 panel opinion for that proposition. *Hastings*, 560 N.E.2d at 667 (citing *Smith v. State*, 408 N.E.2d 614, 621 (Ind. Ct. App. 1980)).

[31]     But, in 1985, the Indiana Supreme Court overruled *Smith v State* on exactly that point. *Armour v. State*, 479 N.E.2d 1294, 1297 (Ind. 1985) (overruling *Smith*). Thus, the reincorporation of that defunct 1980 precedent in *Hastings*, and, through *Hastings*, *Dexter* and subsequent opinions, was legally erroneous, and the trial court here erred when it relied on those mistaken understandings of criminal neglect of a dependent in its instructions to the jury. The correct legal standard is the subjective standard of culpability as defined by the Indiana Code and as applied to the crime of criminal neglect of a dependent, namely, that the defendant was subjectively aware of a high probability that he had exposed a dependent to an actual and appreciable danger, a danger that is substantially beyond normal childhood risks. *Burden*, 92 N.E.3d at 675.

[32]     Nonetheless, we review jury instructions in their entirety, and in Final Instruction 5 the court instructed the jury on the statutory definition of "knowingly," which is the subjective standard. By doing so, the court instructed the jury that that standard applied "to every material element of the prohibited conduct." Tr. Vol. 6, p. 10. Thus, despite the jury instructions' erroneous references to a reasonable-person standard, the jury was still instructed that Dirig had to be subjectively aware of that standard along with the material elements of the offense, and he could not be found guilty unless he had that subjective awareness. Accordingly, the erroneous language in Final Instructions 6 and 9 placed an additional burden on the State, not Dirig, by requiring the

State to prove not just Dirig's subjective awareness but his awareness of an objective standard of reasonableness as well.

[33] Furthermore, Final Instruction 9 instructed the jury that Dirig had to have placed T.C. in a "dangerous situation" that presented an "actual and appreciable danger" to T.C. that went "substantially beyond" normal childhood risks. *Id.* at 11. That language is legally correct. *Burden*, 92 N.E.3d at 675. The jury also was instructed to read the instructions together, and Final Instruction 9's correct language is not necessarily inconsistent with the erroneous language in Final Instructions 6 and 9. That is, the most natural reading of the instructions as a whole is that the State had to prove that Dirig's actions and inactions crossed both an objectively unreasonable standard *and also* the subjective standard that Dirig had knowingly placed T.C. in an actual and appreciable danger that went substantially beyond normal childhood risks. We discern no reasonable reading of the jury instructions as a whole that would permit an understanding that Dirig could be found guilty *solely* based on the inapplicable definition of neglect as the want of reasonable care. *See, e.g.*, *Dunn*, 230 N.E.3d at 916.

[34] We also conclude that the erroneous instructions are not reversible error under the fundamental error doctrine. Our Supreme Court's opinion in *Dunn* is a good example of what reversible error looks like under the fundamental error doctrine for a mistaken jury instruction. In *Dunn*, the State charged the defendant with murder, and, in her own defense, Dunn argued that her actions

were justified in the defense of her own dwelling. There was also an issue in the evidence as to whether her actions were justified in defense of herself.

[35] In its instructions to the jury, the court stated that the State had the burden to prove that the defendant "did not act in self-defense and/or act in defense of her dwelling." *Id.* at 916 (bold font removed). Our Supreme Court concluded that the "and/or" language mistakenly allowed the jury to conclude that the State needed only negate one of the proffered defenses rather than both. *Id.*

[36] As the defendant did not object to the "and/or" language at trial, our Supreme Court went on to consider the impact of the erroneous instruction under the fundamental error doctrine. And the Court concluded that the mistaken instruction denied the defendant of a fundamentally fair trial because the instructional error was emphasized, rather than cured, by the State during its closing argument; because the error undermined the defendant's affirmative defense; and because the defendant's affirmative defense was "a strong case." *Id.* at 917-19. The Court reversed the defendant's murder conviction accordingly.

[37] Dirig's case is distinguishable from *Dunn*. First, the erroneous instructions here did not create a reasonable risk that Dirig was found guilty of something less than required under the law. Second, unlike the closing argument in *Dunn*, here, the State's closing argument to the jury repeatedly emphasized Dirig's subjective awareness of T.C.'s mental-health and behavioral conditions and Dirig's subjective awareness of the high chance of danger that he had placed

T.C. in on November 22. Third, unlike the defendant in *Dunn*, Dirig presented no compelling affirmative defense. Indeed, Dirig concedes in his brief to our Court that "[t]he most important facts [we]re undisputed" at his trial. Appellant's Br. at 37. We therefore conclude that there is no reversible error in the final jury instructions under the fundamental error doctrine.

## Conclusion

For all of these reasons, we affirm Dirig's conviction.

Affirmed.

Altice, C.J., and DeBoer, J., concur.

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana