## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 11 2019, 8:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael Frischkorn
Frischkorn Law LLC
Fortville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Brandee Johnson, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | July 11, 2019 <br><br> Court of Appeals Case No. 18A-CR-1754 <br><br> Appeal from the Hancock Superior Court <br><br> The Honorable Terry Snow, Judge <br><br> Trial Court Cause No. 30D01-1801-F5-168 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Brandee Johnson was convicted of neglect of a dependent, a Level 6 felony, and neglect of a dependent resulting in bodily injury, a Level 5 felony. The trial court sentenced Johnson to serve four years in the Indiana Department of Correction ("DOC"), with two years suspended to active probation, consecutive to two years in the Hancock County jail, suspended to formal probation. Johnson appeals and presents two issues for our review, namely: (1) whether the evidence was sufficient to support her convictions of neglect of a dependent; and (2) whether her sentence is inappropriate in light of the nature of the offenses and her character. Concluding the evidence was sufficient to support her convictions and her sentence is not inappropriate, we affirm.

# Facts and Procedural History

[2] The facts most favorable to the verdicts are as follows. Johnson and her husband, Quantae ("Father"), lived in a two-bedroom townhome in Carmel, Indiana with their six children – two boys, Q.J.J., born September 11, 2001, and Q.A.J., born December 28, 2002, and four girls, including B.P.J., born May 19, 2005. The other three girls were all younger. Johnson worked as a paralegal at a law firm while Quantae homeschooled the children during the day. Johnson did all of the cooking. At home, the three oldest children were subjected to a discipline system that included forced exercise for multiple hours, physical abuse, and the withholding of food. The exercise included running in

place, lifting weights, push-ups, sit ups, back bends, and other activities such as standing on one foot for hours. The exercise would begin around 4:00 or 5:00 a.m. and last until 9:00 or 10:00 a.m. The older children were usually not given breakfast and violations of the system would result in the loss of lunch or dinner, or both, and they were rewarded with food for "telling" on each other.[1] Q.J.J., Q.A.J., and B.P.J. slept on the floor in the hallway and were given less food than the younger children, who shared a bedroom. Although the system was primarily administered by Father, Johnson was aware of and agreed with the punishment system. The three youngest children were not included in this system of discipline.

[3] Cameras were installed throughout the home to allow Johnson and Quantae to monitor the children's exercise and to ensure that no one was stealing food from the kitchen or master bedroom closet where they also kept food. Q.J.J. was punished frequently for stealing food from the kitchen, stores, and the trash, and he ran away from home approximately ten times. Q.J.J.'s clothes and shoes were taken away, and he was only allowed to wear underwear inside the home, which his parents believed would prevent him from running away.

[4] On July 5, 2016, Q.J.J. ran away from home and went to Walmart where he selected two "lunchables." Transcript of Jury Trial, Volume II at 202. Store

---

[1] Although it appears the three younger children were not punished in this manner, it is unclear whether they were rewarded with additional food for "telling" on any of their siblings. *See* Transcript of Jury Trial, Volume III at 180.

employees discovered him eating the stolen lunchables in the store restroom. After he was caught, Q.J.J. was returned home, where he was punished. His parents instructed his siblings to line up and hit him.

[5] On the morning of August 24, 2016, Quantae told Q.J.J. he would lose dinner as punishment for "slacking off" while exercising. *Id.* at 234. Q.J.J. testified, "I was already not getting lunch that day and so I was like, okay, I can't do this anymore." *Id.* He waited until Quantae went into another room to help one of his siblings, grabbed clothes, ran downstairs, and fled the house. He hid in the bushes near the house, put on the clothes, and watched as Quantae and his siblings searched for him. After they passed him, Q.J.J. walked to a local Kroger store, stole two backpacks, and filled the backpacks with food. When he left the store, he sought shelter from a severe thunderstorm and ended up sleeping in a cardboard box that he found in a recycle bin.

[6] Johnson contacted the Carmel Police Department ("CPD") to report that Q.J.J. had run away. The next morning, August 25, CPD Officer David Vanderbeck responded to a report of a suspicious person near Walgreens that matched Q.J.J.'s description. Officer Vanderbeck located Q.J.J. with a backpack filled with food he believed had been stolen from Kroger. Q.J.J. appeared to be "skin and bones[,]" tr. vol. II at 111, and "looked like he just came out of [a] World War II prisoner camp[,]" *id*. at 115. Officer Vanderbeck was "shocked at his size[,]" and how "sickly" he appeared, and explained that Q.J.J. did not look how "a typical fourteen year old male should look[.]" *Id*. at 110-11. Concerned for Q.J.J.'s overall health and noting he also appeared to be limping

due to an ankle injury, Officer Vanderbeck called the paramedics to conduct a medical evaluation. During the assessment, Q.J.J. stated that "there were some things going on at home" but did not want to disclose any information. *Id*. at 122. Q.J.J. was taken to the CPD where he was interviewed by Detective Nancy Zellers.

[7] Following the interview with Detective Zellers, Payton Lill, an assessment worker with the Hamilton County Department of Child Services ("DCS") participated in a second interview with Q.J.J. Initially, Lill observed that Q.J.J. was "very sickly looking, very pale, . . . very thin." *Id*. at 127. She stated, "You could see his bones. He did not look to be his age. He looked to be about nine years old. . . . I saw bruising around, along his spine, on his chest. There was bruising around his ankles and he had . . . blisters all over his feet." *Id*. Q.J.J. told Lill that his parents forced him to exercise excessively which had caused the blisters on his feet. He was then transported to Peyton Manning Children's Hospital in Indianapolis for a medical evaluation.

[8] Lill and Detective Zellers then met with Johnson and Quantae at the police station. During the interview, Johnson was very defensive and appeared to be irritated that she was at the CPD. Johnson told Lill that Q.J.J. was a "horrible" child, accused him of "lying, stealing, . . . being manipulative[,]" and claimed that he had "ruined their lives." *Id*. at 129. Johnson stated that Q.J.J. had caused their family to be evicted from houses in the past. In addition, Johnson explained how Q.J.J. was disciplined, which Lill testified included:

excessive working out, which included um, running in place, pushups, sit ups. I think back bends. Um, she also was taking away snacks. [She and Quantae] had camera's [sic] set up and the hall way and the kitchen so that [Q.J.J.] could not, . . . so he wouldn't be able to get into the food and wouldn't be able to eat the snacks. . . . [T]hey also took away his clothes and shoes . . . so he was down to his underwear because they thought that would prevent him from running away.

*Id.* at 140-41. Johnson stated she was "tired of [Q.J.J.'s] drama[,]" that he steals food from the house and garbage, and that Quantae set up cameras to monitor Q.J.J. "because no one would help her." Tr., Vol. III at 105-06.

[9]  Due to the bruising and marks found on Q.J.J., Lill asked Johnson to sign a Safety Plan, which required her to not leave bruises or marks on the child, follow the doctor's recommendations, and provide the child with adequate food, clothing, and shelter. However, Johnson was "so uncooperative" and would not allow Lill to go over the Safety Plan or see the other five children. Tr., Vol. II at 130. Eventually, Johnson refused to continue speaking with Lill and Detective Zellers, requested that they speak with her attorney, and left the police station.

[10] That same day, CPD officers executed a search warrant on the Johnsons' townhome to recover "computers, electronic and videotaping type of equipment." *Id.* at 205. Johnson, Quantae, and the other five children were present. During the search, Officer Sean Brady observed a refrigerator "packed with food" and discovered junk food, such as cereal, Pop Tarts, and breakfast bars, stored on the top shelf of the master bedroom closet. *Id.* at 207, 209.

Officers also discovered a camera upstairs in the laundry room area focused toward the master bedroom door.

[11] Q.J.J. was admitted to the hospital after an evaluation and was referred to Dr. Cortney Demetris, the medical director of the hospital's Child Protection Team. Dr. Demetris conducted a medical evaluation of Q.J.J. on August 26 at which time he presented with several bruises on his back and chest and swelling and tenderness of his ankle. Q.J.J. told Dr. Demetris that his father "whooped" him, said that he sprained his ankle when he fled the home, and explained the family's discipline system, including the excessive exercise, abuse, and withholding of food. Tr., Vol. III at 169. Specifically, he disclosed that recently he had not been offered breakfast; his lunch consisted of a "lunchable" and cheese puffs; "sometimes he was allowed to eat" the home-cooked meals Johnson made but when he was not, he would eat a TV dinner or ramen noodles; he was prohibited from having snacks; and he was only permitted to drink water. *Id*. at 170.

[12] Dr. Demetris determined that Q.J.J. was very small for his age. In fact, an average male child at Q.J.J.'s age would be expected to weigh approximately 122 pounds and be 68 inches tall. However, Q.J.J. weighed 72 pounds and was 59 inches tall at the time he was admitted to the hospital, which, based on Dr. Demetris' calculation, placed him below the third percentile on the growth chart. His growth parameters were consistent with severe malnutrition. The same day, Dr. Demetris spoke with Johnson via telephone and Johnson reported what she was feeding him – Pop Tarts and fruit for breakfast,

lunchables and cheese balls for lunch, homemade dinners that he would be offered a portion of, no snacks, and water – all contingent on his behavior. Based on a nutritionist's estimate, Q.J.J. had been receiving only thirty-five to fifty percent of his recommended daily caloric intake. During this conversation, Johnson reported that Q.J.J. had been stealing, lying, running away, eating food and other waste from the garbage, and stealing food from grocery stores. As a result, Johnson had locked the food up and got rid of the can opener; however, Q.J.J. then began to eat non-food items, such as whey protein powder, and Johnson even suspected that he ate a bottle of Tylenol. Johnson explained that the children were encouraged to tell on each other and were rewarded with extra food. Dr. Demetris diagnosed Q.J.J. with severe malnutrition based on inadequate caloric intake and believed if his level of malnutrition continued, he would be at risk for death. Q.J.J. gained six to seven pounds in one week.

[13] DCS visited the Carmel townhome to conduct welfare checks on the other five children; however, no one was home. Officers attempted to assist DCS but were having trouble locating the family. At some point, Detective Zellers obtained arrest warrants for Johnson and Quantae based on the medical records and information provided by Q.J.J. Several days later, on August 29, the trial court held a detention hearing during which Johnson informed the court that the family was staying in a hotel in Indianapolis.[2] Following the hearing,

---

[2] It is unclear from the record how Johnson was notified of the hearing.

Johnson was arrested, and officers arrested Quantae at the hotel where he was staying with the five children. DCS took the children to Cherish Center to be interviewed and then to the hospital for medical evaluations.

[14] On August 31, then-thirteen-year-old Q.A.J. was transported and admitted to Peyton Manning Children's Hospital where he was evaluated by Dr. Demetris. Q.A.J. was thin and small for his age and "appeared to be significantly emotionally distressed. He was uncooperative and was unable to answer . . . most questions [and d]id not have a normal interaction style of his age." Tr., Vol. III at 195. He refused portions of the exam, but Dr. Demetris was able to perform a general assessment. She observed his back and ribs. He weighed 62 pounds and was 54.5 inches tall, placing him below the third percentile of his age on the growth chart. Dr. Demetris also diagnosed him with severe malnutrition caused by neglect over the course of months and believed he would have been at risk of death had the malnutrition continued. Both sons were hospitalized for one week. Following discharge, Q.J.J. was placed in foster care and Q.A.J. was placed in an inpatient mental health treatment facility.

[15] On August 30, 2016, the State charged Johnson with neglect of a dependent in Hamilton County. During the course of the proceedings, the trial court granted Johnson's motion to change venue and transferred the case to Hancock County, where the information was amended to one count of neglect of a dependent (Q.J.J.) resulting in bodily injury, a Level 5 felony, and one count of neglect of a dependent (Q.A.J.), a Level 6 felony. Specifically, the information alleged

that, between July 5, 2016 and August 25, 2016, Johnson knowingly placed her sons in a situation that endangered their lives or health when she "withheld a sufficient amount of food causing [them] to present with severe malnutrition[.]" Appellant's Appendix, Volume 2 at 82-83.

[16] A jury trial was held May 21-23, 2018, and Johnson was found guilty as charged. A sentencing hearing was held on June 27, 2018, and the trial court identified the following aggravating and mitigating circumstances:

> [The] Court does find aggravating factors in this case. That the harm, injury and damage suffered by the victims are greater than the elements of the crime required. . . . [T]his was a continuous and an ongoing uh, action by the defendant. . . . Court does find that she [has] a mitigator. That for significant, well basically all of her life, uh, she led a crime free life. She had no prior criminal history. She was a, basically the sole provider for her family and did so for many years. She obtained an education on her own and put that to work so she could support her family. Those are mitigators. It's a very difficult case under the best of circumstances. And this is not the best of circumstances.

Tr., Vol. IV at 141-42. The trial court sentenced Johnson to four years in the DOC with "2 years suspended to active probation on Count 2. The first year of probation will be on Home Detention as a condition of probation. [Johnson] is further sentenced to 2 year[s] to the Hancock Co. Jail on Count 1 suspended to formal probation and shall be consecutive to Count 2." Appealed Order 1-2. Johnson now appeals. Additional facts will be supplied as necessary below.

# Discussion and Decision

# I. Sufficiency of the Evidence

## A. Standard of Review

Our standard of review upon a challenge to the sufficiency of the evidence is well established: we do not reweigh the evidence or judge the credibility of the witnesses. *Burden v. State*, 92 N.E.3d 671, 674 (Ind. Ct. App. 2018). We consider only the evidence supporting the verdict and any reasonable inferences that can be drawn therefrom. *Morris v. State*, 114 N.E.3d 531, 535 (Ind. Ct. App. 2018), *trans. denied.* Thus, we consider conflicting evidence most favorably to the verdict. *Silvers v. State*, 114 N.E.3d 931, 936 (Ind. Ct. App. 2018). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). The evidence need not overcome every reasonable hypothesis of innocence; it is sufficient if an inference may reasonably be drawn from the evidence to support the verdict. *Silvers*, 114 N.E.3d at 936.

## B. Neglect of a Dependent

On appeal, Johnson argues that the State failed to prove she had the requisite mens rea to neglect the children. Specifically, she contends that "the evidence presented does not support reasonable inferences that [she] knew that she was depriving [Q.J.J.] and [Q.A.J.] of necessary support, specifically sufficient food." Brief of the Appellant at 14-15. We disagree.

[19] "A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally . . . places the dependent in a situation that endangers the dependent's life or health . . . commits neglect of a dependent, a Level 6 felony." Ind. Code § 35-46-1-4(a)(1). However, the offense is a Level 5 felony if it results in bodily injury. Ind. Code § 35-46-1-4(b)(1)(A).[3] A person engages in conduct "knowingly" if, when she engages in the conduct, she is aware of a high probability that she is doing so. Ind. Code § 35-41-2-2(b). For purposes of the child neglect statute, "a 'knowing' mens rea requires a subjective awareness of a 'high probability' that a dependent has been placed in a dangerous situation." *Villagrana v. State*, 954 N.E.2d 466, 468 (Ind. Ct. App. 2011). Because such a finding requires the fact-finder to infer the defendant's mental state, we look to all surrounding circumstances of a case to determine if a guilty verdict is proper. *Id.* "Our court has repeatedly held that the Neglect Statute must be read as applying only to situations that expose a dependent to an 'actual and appreciable' danger to life or health." *Burden*, 92 N.E.3d at 675 (internal quotation omitted). And we have explained,

> to be an "actual and appreciable" danger for purposes of the neglect statute when children are concerned, the child must be exposed to some risk of physical or mental harm that goes *substantially beyond the normal risk* of bumps, bruises, or even worse that accompany the activities of the average child. This is

---

[3] A "dependent" is defined as "an unemancipated person who is under eighteen (18) years of age" or "a person of any age who has a mental or physical disability." Ind. Code § 35-46-1-1.

consistent with a "knowing" mens rea, which requires *subjective awareness of a "high probability" that a dependent has been placed in a dangerous situation, not just any probability*.

*Scruggs v. State*, 883 N.E.2d 189, 191 (Ind. Ct. App. 2008) (quoting *Gross v. State*, 817 N.E.2d 306, 309 (Ind. Ct. App. 2004)), *trans. denied*.

[20] Here, there is no dispute that either child was Johnson's dependent, that Johnson withheld food from them which caused severe malnutrition, or that the withholding of food endangered the children's lives or health. However, in essence, Johnson argues she was not subjectively aware of a high probability that depriving her sons of food would endanger their health and lives.

[21] The evidence most favorable to the jury's verdicts is that Johnson and Quantae used the deprivation or withholding of food as punishment for what they perceived to be the children's bad behavior. Although Johnson argues that Q.J.J. was provided with dinner, the evidence also reveals that when he was provided with dinner, his portion was smaller than the other children's or he would be provided a TV dinner or ramen noodles instead of Johnson's home cooked meal.

[22] In her brief, Johnson argues that Quantae was in control of the punishment system – that he would withhold the food. She contends that "[b]eing aware of a policy is not the same as being in control of it or having a full understanding of the impact of that policy." Br. of Appellant at 15. It appears that Johnson was in charge of all of the cooking and not only was she aware of the

punishment/reward system, she was knowledgeable about how it worked and articulated the system to Dr. Demetris. And during her conversation with Dr. Demetris, Johnson acknowledged that Q.J.J. was stealing food from the home, stores, and dumpsters and he began to eat non-food items, which clearly indicates knowledge that Q.J.J. was hungry and was not receiving an adequate amount of food. In fact, when Dr. Demetris suggested that Q.J.J.'s behavior might indicate he was not receiving enough food, Johnson agreed to consider it but had also told Dr. Demetris that she "was not obligated to provide [Q.J.J.] with more than the base, the bare minimum. Like the basics of food." Tr., Vol. III at 179.

[23] Further, the evidence supports an inference that Johnson was subjectively aware of a high probability that withholding of food was endangering the children's health and ultimately, their lives. Testimony revealed that nearly every individual who interacted and observed her sons immediately noticed how thin, small, and sick they appeared. Upon locating Q.J.J. in a box near Walgreens, Officer Vanderbeck commented that he "looked like he just came out of [a] World War II prisoner camp[.]" Tr., Vol. II at 115. Payton Lill, Dr. Demetris, and the guardian ad litem all testified that the children were so thin they were able to see their bones. Photos of the children, including photos of Q.J.J.'s physical injuries, were admitted into evidence and illustrate the severity of the children's malnutrition.

[24] Dr. Demetris testified that "[t]he severity of the growth problems that were present in [Q.J.J. and Q.A.J.] were such that a reasonable parent would have

recognized that the children were small and not adequately growing." Tr., Vol. III at 201-02. She further testified that Q.J.J. "was clea[rly] by his medical . . . assessment, starving. And I saw his behavior as desperate attempts for a child to meet his most basi[c] need of adequate food." *Id*. at 181. Although Q.J.J. testified that typically his father enforced the punishments, Johnson was present at times. Similarly, B.P.J. testified that their father would suggest the punishments, Johnson would agree with the punishment, and Johnson had told her that she "wishe[d] [Q.J.J.] was never born . . . that he died at birth." *Id*. at 51. The evidence also shows that Johnson threatened to physically harm and kill Q.J.J. and B.P.J.

[25] In sum, Johnson was aware that her sons were not receiving an adequate amount of food. She acknowledged that she provided only the "bare minimum," her sons were noticeably thin and appeared sick to others, and she even expressed a desire to punish her sons' bad behavior by withholding food. We conclude there is ample evidence from which the jury could infer Johnson knowingly deprived her sons of food which led to severe malnutrition, endangering their health and lives.

## II. Inappropriate Sentence

[26] Next, Johnson argues that her sentence is inappropriate in light of the nature of the offenses and her character. Again, we disagree.

# A. Standard of Review

We may review and revise criminal sentences pursuant to the authority derived from Article 7, Section 6 of the Indiana Constitution. Indiana Appellate Rule 7(B) empowers us to revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Because a trial court's judgment "should receive considerable deference[,]" our principal role is to "leaven the outliers." *Cardwell v. State*, 895 N.E.2d 1219, 1222-25 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The defendant bears the burden to persuade this court that his or her sentence is inappropriate, *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006), and we may look to any factors appearing in the record for such a determination, *Stokes v. State*, 947 N.E.2d 1033, 1038 (Ind. Ct. App. 2011), *trans. denied*.

*Reis v. State*, 88 N.E.3d 1099, 1101-02 (Ind. Ct. App. 2017).

# B. Nature of Offenses

[27] Our analysis of the nature of the offense prong begins with the advisory sentence. *Id*. at 1104. The advisory sentence is the starting point selected by our legislature as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. The sentencing range for a Level 5 felony is between one and six years with an advisory sentence of three years, Ind. Code § 35-50-2-6(b),

and the range for a Level 6 felony is between six months and two and one-half years, with an advisory sentence of one year, Ind. Code § 35-50-2-7(b).

[28] With respect to the nature of the offenses, Johnson argues that she "truly believed she was providing sufficient food" for her sons. Br. of Appellant at 17. The nature of the offense is found in the details and circumstances surrounding the offense and the defendant's participation therein. *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). In all aspects, the details and circumstances of Johnson's crimes are serious. Johnson knowingly withheld food from her sons as punishment for bad behavior, ultimately leading to severe malnutrition.

[29] Upon admission to the hospital, Q.J.J. weighed nearly *fifty pounds* less and was nine inches shorter than the average fourteen-year-old male. Q.A.J. weighed 62 pounds and was 54.5 inches tall when he was admitted to the hospital. Based on height and weight, Dr. Demetris calculated that both boys were below the third percentile on the growth chart. Similarly, both boys were "skin and bone" and appeared sick. Furthermore, Q.A.J. appeared to be emotionally distressed and refused to fully cooperate upon admission to the hospital. When he was discharged, Q.A.J. was then admitted to an inpatient mental health facility for post-traumatic stress and depression.

[30] Additionally, the evidence reveals that Q.J.J. was so hungry that he stole food from the home and stores, and raided dumpsters. He even resorted to eating non-food items, such as whey protein powder and possibly medicine. Johnson was aware of these circumstances yet continued to withhold food as

punishment for, among other things, the behavior her conduct was causing. At trial, Q.J.J. testified that, on the morning of August 24, 2016, his father told him he was not going to get dinner because he was "slacking off" during the workout and he was already not getting lunch that day. Tr., Vol. II at 234. When asked why he ran away from home that day, he said "[c]ause I was hungry and we were getting like beaten over it. Mostly I just wanted food." *Id.* at 232. Dr. Demetris testified that, had the malnutrition continued, both of Johnson's sons would have been at risk for death. Given the evidence of the serious nature of the offenses and harm inflicted, we cannot conclude Johnson's sentence is inappropriate.

## C. Character of Offender

[31] A defendant's life and conduct are illustrative of her character. *Morris*, 114 N.E.3d at 539. Johnson argues that her character does not support her sentence because she has two bachelor's degrees, no criminal history, was fully employed, and is unlikely to reoffend. Although we acknowledge these factors, they are outweighed by Johnson's apparent contempt for her sons, particularly Q.J.J., and her unforgiving attitude.

[32] The record is permeated with Johnson's comments demonstrating her animosity toward Q.J.J. During her interview at CPD, Johnson told Payton Lill and Detective Zellers that Q.J.J. lied, stole, and was manipulative. She explained "how horrible of a child he was. . . . [and] talked about how much he had ruined their lives." Tr., Vol. II at 129. It appears that Johnson blamed the family's past evictions on Q.J.J.'s behavior. B.P.J. also testified that Johnson

stated she "wishe[d] [Q.J.J.] was never born. . . . that he died at birth." Tr., Vol. III at 51. And again, Johnson told Dr. Demetris that she was only required to provide Q.J.J. with the bare minimum in terms of food and disagreed he was malnourished.

[33] In addition, several of Johnson's former coworkers testified that Johnson only talked about having three girls. When a coworker was asked if she was aware of Johnson having children, she answered she was aware Johnson had three daughters. One coworker testified, "I remember [Johnson's] conversations with other people discussing sons and I remember her saying, I'm so glad I don't have boys." *Id.* at 84. Johnson spoke about her three daughters and had pictures of her three youngest daughters at work but did not talk about male children. Johnson's attitude and comments in the record reflect poorly on her character and we decline to revise her sentence.

# Conclusion

[34] For the reasons set forth above, we conclude the evidence is sufficient to support Johnson's convictions and her sentence is not inappropriate in light of the offenses and her character. Accordingly, we affirm.

[35] Affirmed.

Baker, J., and Najam, J., concur.